TRUJILLO & TRUJILLO, APLC
Robert Trujillo, Esq. (CA SBN 148975)
Melody Trujillo, Esq. (CA SBN 165218)
41593 Winchester Road, Suite 201
Temecula, CA 92590
Tel: 951-296-9529
Email: trulaw@trujillo-law.us

Suzanne Skolnick, Esq. (CA SBN 211076)
2888 Loker Avenue East, Suite 110-F
Carlsbad, CA 92010
Tel. (760) 405-4397
Email: suzanne@skolnicklawgroup.com

Lewis Khashan, Esq. (CA SBN 275906)
38975 Sky Canyon Drive Suite 201
Murrieta, CA 92563
Tel. (951) 775-7279
Email: lewis@khashanlaw.com
Attorneys for Plaintiff DAVID MANZO,
By and through his conservator, Genoveva
Manzo.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MANZO, by and through his Conservator, Genoveva Manzo,<br><br>Plaintiff,<br>v.<br>COUNTY OF RIVERSIDE; STANLEY SNIFF, Sheriff of Riverside County; WILLIAM DI YORIO, Undersheriff of Riverside County, ANDREW SHOUSE, Captain of Robert Presley Detention Center; JERRY GUTIERREZ, Corrections | Case No. 5:17-cv-1165-JGB-SP<br><br>**PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES AND VIOLATIONS OF CIVIL RIGHTS**<br><br>**JURY TRIAL DEMANDED** |

1

1  Assistant Sheriff; Deputy MICHAEL                    )
2  MCCOLLUM; Deputy PAUL                                )
3  SALAZAR; Deputy MATTHEW                              )
   BELL; Deputy ERNESTO                                 )
4  DOMINGUEZ; Deputy JOSE                               )
5  MONZON; Deputy GREGORY                               )
   BRESYN; Sergeant STONE; Deputy                       )
6  JAMES GRIESINGER; Deputy                             )
7  PETER MITCHELL; Deputy JESUS                         )
   PEREZ; Deputy JONATHAN TOAN;                         )
8  Sergeant CHRISTOPHER WEDEL;                          )
9  Nurse EMEKA AKPAMGBO; Nurse                          )
   KON YOUNG KIM, Nurse JASON                           )
10 CORTEZ, KEVIN SANCHEZ; ROSS                          )
11 LUNSTED; and DOES 1-125,                             )
12          Defendants.                                 )

13        COMES NOW PLAINTIFF DAVID MANZO, By and Through his

14 Conservator, Genoveva Manzo, though his attorneys of record and alleges and

15 complains as follows:

16

17                        **PRELIMINARY STATEMENT**

18

19        This matter arises from 35-year-old Plaintiff David Manzo being rendered a

20 quadriplegic at the hands of County of Riverside Sheriff's department employees

21 when they failed to utilize universally accepted spinal or medical precaution

22 measures to protect Plaintiff's spine from paralysis following injuries Plaintiff

23 sustained in a fight with another inmate at Robert Presley Detention Center in

24 Riverside, California.  The County of Riverside, and its employees, have engaged

25 in a pattern and practice of violating Plaintiff's civil rights from the time of his

26 initial arrest, wherein deputies used excessive force against Plaintiff, including

27

28

**PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES**   CASE NO: 5:17-cv-1165-JGB-SP

slamming Plaintiff to the ground, beating him, and pinning him to the ground with the deputies' knee and full weight on the back of plaintiff's neck; to their failure to protect plaintiff from violence at the hands of a known, vicious inmate; to the final moment when County of Riverside jail employees manhandled Plaintiff's injured body causing catastrophic spinal cord injuries and rendering plaintiff a 35-year-old quadriplegic.  A grave injustice has occurred as a result of the County of Riverside and its various employees' deliberate indifference to Plaintiff's rights.

## JURISDICTION

1.      This action arises under Title 42 of the United States Code, Section 1983.  Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Section 1331 and 1343.  In addition, this Court has pendent and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims alleged in this complaint.

## VENUE

2.      The unlawful acts and practices alleged herein occurred in the County of Riverside, State of California, within this judicial district.  Therefore, venue lies in the United States District Court for the Central District of California.

## CLAIMS REQUIREMENT

3.      Plaintiffs have complied with the requirements of California Government Code section 900, et seq., where an action for state court claims is

3

filed against a public entity and its employees for the incident occurring on October 25, 2016.

**CONSERVATORSHIP ESTABLISHED**

4.     On February 17, 2017, Letters of Conservatorship were issued by the Superior Court of California for the County of Riverside, naming Genoveva Manzo as conservator over Plaintiff David Manzo.

**PARTIES**

5.     Plaintiff, David Manzo, an individual, by and through his conservator, Genoveva Manzo (hereafter "Manzo"), is, and at all times mentioned herein was, a resident of the State of California.

6.     Defendant County of Riverside (hereinafter "County") is a public entity which is responsible for and administers the Robert Presley Detention Center (hereinafter "RPDC") through its agency, the Riverside County Sheriff's Department (hereinafter "RCSD").  County promulgates policies and practices for the housing, custody, care, safekeeping and protection of inmates in the RPDC. At all times relevant, County was responsible for ensuring that the actions, omissions, policies, procedures, practices and customs of the Riverside County Sheriff's Department and its employees and agents complied with the laws of the Constitution of the United States and of the State of California.

7.     Defendant Sheriff Stanley Sniff (hereafter "Sniff") is, and at all times

herein mentioned, was the Sheriff of Riverside County.  Sheriff Sniff ran,

operated, oversaw, administered, supervised and was otherwise responsible for the

conduct of the Riverside County Sheriff's Department at the Robert Presley

Detention Center, including the conduct of emergency medical response teams at

the jail. As Sheriff of Riverside County, Sniff has ultimate supervision and

management responsibility over the five jails, or correctional facilities in

Riverside County, all managed by the Sheriff's Department Corrections Division.

Sniff at all times possessed the power and the authority and was charged by law

with the responsibility to enact policies and to prescribe rules and practices

concerning the operation of the Riverside County Sheriff's Department and/or was

the supervisor of the other defendant officers named herein.  Sniff is sued in his

personal/individual capacity for his own culpable action or inaction in the training,

supervision, or control of his subordinates, or for his acquiescence in the

constitutional deprivations alleged herein.

     8.     Defendant William Di Yorio (hereafter "Di Yorio"), Undersheriff of

Riverside County, is, and at all times herein mentioned was, the Undersheriff of

Riverside County.  Di Yorio ran, operated, oversaw, administered, supervised and

assisted Defendant Sniff with managing the day-to-day operations of the Riverside

County jails and was otherwise responsible for the conduct of the RCSD at the

RPDC and serves as Defendant Sniff's Chief of Staff.

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

9.     Defendant Corrections Assistant Sheriff Jerry Gutierrez (hereafter "Gutierrez") is, and at all times herein mentioned, was the Corrections Assistant Sheriff of Riverside County.  Assistant Sheriff Gutierrez ran, operated, oversaw, administered, supervised and was otherwise responsible for the conduct of the Riverside County Sheriff's Department at the Robert Presley Detention Center.

10.     Defendant Captain Andrew Shouse (hereafter "Shouse") is, and at all times herein mentioned, was the Captain of Robert Presley Detention Center for the Riverside County Sheriff's Department.  Captain Shouse ran, operated, oversaw, administered, supervised and was otherwise responsible for the conduct of the Riverside County Sheriff's Department at the Robert Presley Detention Center.

11.     Defendant Deputy Matthew Bell, Officer ID # N3564 (hereafter "Bell") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Bell was responsible for the protection, care and custody of the inmates at RPDC and was involved in moving Plaintiff, David Manzo after Manzo was injured in the fight with Defendant Kevin Sanchez.

12.     Defendant Deputy Ernesto Dominguez, Officer ID #5582 (hereafter "Dominguez") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

Riverside County Sheriff's Department.  Deputy Dominguez was responsible for the protection, care and custody of the inmates at RPDC and was involved in moving Plaintiff, David Manzo after Manzo was injured in the fight with Defendant Kevin Sanchez.

13.     Defendant Deputy Jose Monzon, Officer ID #5233 (hereafter "Monzon") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Monzon was responsible for the protection, care and custody of the inmates at RPDC and was involved in moving Plaintiff, David Manzo after Manzo was injured in the fight with Defendant Kevin Sanchez.

14.     Defendant Deputy Gregory Bresyn, Officer ID# N5889 (hereafter "Bresyn") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Bresyn was responsible for the protection, care and custody of the inmates at RPDC and witnessed the events occurring immediately after the fight between Plaintiff and Defendant Kevin Sanchez.

15.     Defendant Sergeant Richard Stone, Officer ID# N2787 (hereafter "Stone") is, and at all times herein mentioned, was a Sergeant working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Sergeant Stone was charged with supervising

deputies at RPDC, responsible for the protection, care and custody of the inmates at RPDC, responsible for carrying out the policies and procedures of RPDC and the Riverside County Sheriff's Department, and witnessed the events occurring immediately after the fight between Plaintiff and Defendant Kevin Sanchez.

16.     Defendant Deputy James Griesinger, Officer ID# N5026 (hereafter "Griesinger") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Griesinger was responsible for the protection, care and custody of the inmates at RPDC and witnessed the events occurring immediately after the fight between Plaintiff and Defendant Kevin Sanchez.

17.     Defendant Deputy Peter Mitchell, Officer ID# N5233 (hereafter "Mitchell") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Mitchell was responsible for the protection, care and custody of the inmates at RPDC and witnessed the events occurring immediately after the fight between Plaintiff and Defendant Kevin Sanchez.

18.     Defendant Deputy Jesus Perez, Officer ID# N4531 (hereafter "Perez") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

County Sheriff's Department.  Deputy Perez was responsible for the protection, care and custody of the inmates at RPDC and witnessed the events occurring immediately after the fight between Plaintiff and Defendant Kevin Sanchez.

19.     Defendant Sergeant Christopher Wedel (hereafter "Wedel") is, and at all times herein mentioned, was a Correctional Sergeant for the Riverside County Sheriff's Department and was charged with supervising deputies at RPDC, responsible for the protection, care and custody of the inmates at RPDC and for carrying out the policies and procedures of RPDC and the Riverside County Sheriff's Department.  Sergeant Wedel was present at the time of the incident and oversaw the extraction of David Manzo from the jail.

20.     Defendant Deputy Jonathan Toan (hereafter "Toan") is, and at all times herein mentioned, was a deputy working Dayroom 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Deputy Toan was responsible for the protection, care and custody of the inmates at RPDC and witnessed the fight between Kevin Sanchez, Ross Lunsted and Plaintiff, David Manzo.

21.     Defendant Nurse Emeka Akpamgbo (hereafter "Emeka") is, and at all times herein mentioned, was a nurse working 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department. Nurse Emeka was responsible for providing medical care and treatment to inmates

at RPDC and witnessed and directly participated in the extraction of Manzo from the jail without providing spinal or medical precautions or following emergency medical protocols and guidelines.

22.     Defendant Nurse Kon Young Kim (hereafter "Young") is, and at all times herein mentioned, was a nurse working 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department. Nurse Young was responsible for providing medical care and treatment to inmates at RPDC and witnessed and directly participated in the extraction of Manzo from the jail without providing spinal or medical precautions or following emergency medical protocols and guidelines.

23.     Defendant Nurse Jason Cortez (hereafter "Cortez") is, and at all times herein mentioned, was a nurse working 5A of the RPCD at the time of the incident and was an employee of the Riverside County Sheriff's Department.  Nurse Cortez was responsible for providing medical care and treatment to inmates at RPDC and witnessed and directly participated in the extraction of Manzo from the jail without providing spinal or medical precautions or following emergency medical protocols and guidelines.

24.     Defendant Deputy Michael McCollum (hereafter "McCollum") is, and at all times stated herein was, a Riverside County Sheriff's Deputy bearing ID No. 4209, and is a resident of California.

25.     Defendant Deputy Paul Salazar (hereafter "Salazar") is, and at all times stated herein was, a Riverside County Sheriff's Deputy bearing ID No. 4599, and is a resident of California.

26.     Defendant Kevin Sanchez (hereafter "Sanchez") is, and at all times herein mentioned, was a resident of the State of California and an inmate at RPDC.

27.     Defendant Ross Lunsted (hereafter "Lunsted") is, and at all times herein mentioned, was a resident of the State of California and an inmate at RPDC.

28.     At all times relevant to this Complaint, Does 1- 50 are and were Sheriff's deputies and/or employees or agents of the County of Riverside.

29.     At all times relevant to this Complaint, Does 51-100 are individuals whose identities are presently unascertained.

30.     Plaintiff is truly ignorant of the names and capacities of Defendant Does 1 – 100, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff is truly ignorant of the facts giving rise to Does 1-100, inclusive's liability, and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

31.     Plaintiffs are informed and believe, and based thereon allege, that each Doe defendant so named is responsible in some manner for the injuries and

damages suffered by Plaintiff.

32.     These defendants were agents, servants, and employees of each of the named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions of the other defendants by making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

## STATEMENT OF FACTS

33.     On September 5, 2016, Plaintiff, David Manzo was a 34 year old Perris, California resident suffering from a mental health disorder, including schizophrenia.  Manzo had been diagnosed a schizophrenic since the age of 16. On September 5, 2016, Defendants Riverside County Sheriff's Deputies Salazar and McCollum responded to a domestic disturbance call at Manzo's home in Perris, California.

34.     Prior to September 5, 2016, Defendant Salazar, in his capacity as a Sheriff's deputy, had interacted with Manzo on numerous other occasions due to Manzo's mental health condition wherein Defendant Salazar would take Manzo to Mental Health Emergency Treatment Services ("ETS") and place Manzo on a Welfare and Institutions Code section 5150 detention.  Several times prior to the

incident, when Defendant Salazar would arrive at Manzo's home for purposes of

taking him to ETS, Manzo would be waiting for Defendant Salazar on the front

lawn while smoking a cigarette. Defendant Salazar would allow Manzo to finish

smoking his cigarette before peacefully taking him into custody and transporting

him to ETS for a 5150 hold.

35.     On September 5, 2016, however, Defendant Salazar arrived to find

Manzo on the lawn of his home smoking a cigarette, Defendant Salazar refused to

let Manzo finish his cigarette and instead demanded that he go immediately with

Defendant Salazar to jail, rather than ETS. At no time did Defendant Salazar or

McCollum conduct any investigation into the call that led them to Plaintiff's

property to begin with. When Salazar told Manzo he must go immediately to jail,

Manzo flicked his cigarette, unintentionally hitting Defendant Salazar in the face

with the cigarette. At that point, Defendant Salazar aggressively tackled Manzo,

knocking him to the ground, forcefully putting his hand and later his knee into the

back of Manzo's neck and holding it there while Manzo was face down on the

ground. Once on the ground, Manzo did not attempt to resist the arrest and

instead, remained on the ground while Defendant Salazar cuffed Manzo. After

Defendant Salazar cuffed Manzo and Manzo exhibited no signs of resistance to

the arrest, Defendant Salazar and Defendant McCollum then began to viciously

beat Manzo with their fists, with each deputy punching Manzo in the head no less

than three times, all while Manzo's head was against the ground.  Manzo was thereafter transported to the Riverside County Sheriff's Perris Station.  He was booked and ultimately transferred to Robert Presley Detention Center (RPDC) in Riverside, California.

36.     At all times, Defendants Salazar and McCollum knew that Manzo suffered from a mental health disorder – namely, schizophrenia.  Both deputies knew that as a result of Manzo's mental health condition, he required special accommodations and that a serious risk to Manzo's health and safety existed by allowing Manzo to interact with other inmates, in particular, inmates who displayed frequent, violent tendencies towards other inmates.

37.     Schizophrenia is a mental health impairment that substantially limits Manzo's major life activities, including his ability to communicate with people, understand people, his ability to learn, and to care for himself in activities of daily living.  Defendants Salazar and McCollum could have and should have offered special accommodations to Manzo including:  communicating with Manzo's caretaker, who was present at the scene; working with his caretaker to approach Manzo in a non-threatening manner, to speak to Manzo in a way that was non-threatening and calming in order to avoid an escalation of the situation and to avoid the use of force; contacting another officer or employee who specializes in communicating with disabled individuals like Manzo to facilitate the necessary

interaction, removal or arrest; by respecting Manzo's comfort zone, engaging in non-threatening communications and gestures with Manzo directly, using the passage of time to defuse the situation, and ceasing the use of force once it was evident that Manzo was unarmed, terrified, no threat to officers and following their instructions.

38.     After Manzo's arrest on September 5, 2016 and at the time of the incident on October 25, 2016, Manzo was temporarily being housed at RPDC pending transfer to Patton – a psychiatric hospital.  Due to his mental illness, Manzo had been deemed mentally incompetent to stand trial by 2 different doctors and the court and therefore, was awaiting transfer to Patton when the October 25, 2016 incident occurred.

39.     Defendant Jerry Gutierrez is, and at all times mentioned herein was responsible for corrections support for all the jails in Riverside County. Gutierrez's job duties include responsibility for ensuring compliance with policies and procedures in County jails.  The Riverside County Sheriff's department has general policies applicable to all of the jails in the County, as well as procedures for each specific jail.  Gutierrez knew that Riverside County jail inmates have been severely injured and even died from violence caused by other inmates before this incident occurred based on his review of statistics dating as far back as 2009.

40.     At RPDC on October 25, 2016, Manzo was the victim of an assault

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

and battery by inmates Defendant Kevin Sanchez and Defendant Ross Lunsted. On that date, while Manzo, Sanchez and Lunsted were in the 5A Dayroom of the RPDC, Sanchez began to threaten, intimidate and physically fight with Manzo. The fight occurred directly in front of the window to the Pod Control room. The Pod Control room overlooks the dayroom with a large window through which jail staff can observe and supervise the inmates in the dayroom. The Pod Control room is manned at all times by at least one deputy. Plaintiff is informed and believes and based thereon alleges, that at the time of the fight between Sanchez and Manzo, Deputy Toan, and possibly other deputies were in the Pod Control room watching Sanchez threaten, intimidate and physically punch Manzo.

41.   The fight between Sanchez, Manzo and Lunsted was recorded on video that was captured from cameras set up in the jail. Plaintiff is informed and believes and based thereon alleges that prior to the physical altercation between Sanchez and Manzo, Sanchez threatened, intimidated and argued with Manzo. First, earlier in the day while Manzo was housed in his cell, Sanchez was seen by deputies on jail cameras to be manipulating the food slot to Manzo's cell which is prohibited. Then, during dayroom time before the physical fight broke out, while Sanchez was playing dice with other inmates, Sanchez intimidated and threatened Manzo again. The incident caused such a commotion that other inmates intervened to try to get Sanchez to "calm down". Plaintiff is informed and

believes that all of the deputies assigned to 5A witnessed or heard the verbal altercation between Manzo and Sanchez before the physical violence against Manzo by Sanchez began.  Thereafter, at approximately 7:43 p.m. on October 25, 2016, Sanchez began to physically attack Manzo.  At the time of the incident, Sanchez can be seen chasing Manzo from one side of the dayroom to the other and back to the other side of the dayroom again.  At one point, Manzo attempts to flee from Sanchez by trying to climb up the stairs to the second level of the dayroom, but he is then punched by Lunsted and pushed back into Sanchez such that Manzo is unable to escape from the attack by Sanchez.  Manzo tried to get away from Sanchez who continued to follow after him relentlessly, continuing the fight, which included multiple hits to Manzo.  Plaintiff is informed and believes and based thereon alleges, that throughout the entire attack of Manzo by Sanchez, jail staff that were on duty for Dayroom 5A, including the staff manning the Pod Control booth, watched the fight occur.  Sanchez then grabbed Manzo from behind, whereupon Sanchez then fell backward to the ground, pulling Manzo to the ground with him, with Manzo landing on top of Sanchez's body.

42.     After Sanchez pulled Manzo to the ground, jail staff then flashed the lights and inmates in the 5A dayroom returned to their cells with the exception of Manzo who remained lying on the floor of Dayroom 5A.  Video of the incident shows Manzo still had use of his limbs while he was awaiting medical attention on

17

the floor of the dayroom.  At that moment, Manzo was still able to roll his body onto its side briefly through his own efforts using his limbs.

43.     Plaintiff is informed and believes and based thereon alleges, that at the time of the incident on October 25, 2016 Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100, knew that Defendant Sanchez was a violent person who repeatedly picked fights with other inmates in the jail and that based on Sanchez's prior conduct toward other inmates that Sanchez would likely threaten, intimidate and harm Manzo. For example, on September 14, 2016, approximately one month before the time Manzo was attacked by Sanchez, it was noted in the Jail Information Management System ("JIMS") that Sanchez was exhibiting bizarre behavior, was kicking the cell door, yelling profanities toward deputies and inciting other inmates and that when given orders by deputies who were trying to restrain him, Sanchez refused to obey the orders.  On October 17, 2016, just 8 days before Sanchez attacked Manzo, deputies also witnessed Sanchez not getting along with his cellmate – which was again noted in the JIMS system.    Sanchez was also found not to get along with his cellmates on February 3, 2014 and March 16, 2014 and had razors in his possession on February 10, 2014 and March 15, 2014.  Sanchez was rehoused on January 19, 2014 because he was a "danger to others". He was also noted in the JIMS system on January 16, 2014 to have "odd" and "unpredictable

behaviors".  JIMS records note that on September 1, 2012, Sanchez assaulted and battered another inmate.  On September 10, 2012 and September 14, 2012 Sanchez was re-housed due to having issues with his cellmate and other inmates.  On September 17, 2012 JIMS notes indicate that Sanchez was removed from the dayroom because "many people are complaining" about his behavior.

44.     All of the deputies, including all of the supervising officers at RPDC have access to the JIMS system and can review an inmate's history and classification at any time to determine the suitability of allowing a violent inmate to interact with a known, schizophrenic pre-trial detainee like Manzo.

45.     Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 knew that Sanchez should not be permitted to have contact with Manzo prior to the time Sanchez attacked Manzo.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 failed to properly classify and segregate Sanchez from Manzo.

46.     On October 25, 2016, Defendants Toan, Wedel, Bell, Dominquez, Monzon, Bresyn, Stone, Griesinger, Mitchell, Perez and other currently unascertained deputies Does 1 to 100 were on duty and tasked with the responsibility of ensuring the safety of inmates in 5A of RPDC.  Defendant Toan witnessed the threats being made by inmate Sanchez on Plaintiff, then witnessed

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE No: 5:17-cv-1165-JGB-SP

the situation escalate into full blown violence against Plaintiff when inmates Sanchez and Lunsted repeatedly punched Plaintiff in the head.  Defendants Stone, Wedel, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 knew or should have known from the length of the fight, the noise coming from dayroom 5A where the fight occurred, and their proximity to the dayroom and the large windows in each of the doorways to the dayroom that the fight was occurring and that Plaintiff was being attacked.

47.     Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 all had access to and the ability and duty to exercise control over the inmates on the 5th floor by using various security measures available to them, including locking cell doors, monitoring and supervising the dayroom, and segregating violent inmates from vulnerable inmates like Plaintiff.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 using controls in the Pod Control booth could control which inmates would be permitted into the dayroom and which would not be permitted into the dayroom.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 could lock cell doors from within the Pod control booth.

48.     At the time of the incident, Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 knew

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

or should have known that Plaintiff was an inmate with mental health needs in protective custody status who was awaiting transfer to a mental health hospital. Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 knew or should have known that Sanchez was violent and that allowing Sanchez to interact with Plaintiff exposed Plaintiff to serious risk of injury at the hands of Sanchez.

49.     Plaintiff is informed and believes and based thereon alleges that, Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 entered the dayroom after the fight at virtually the same time, as a group, such that all the aforementioned defendants had also witnessed the fight through the large windows existing on the doors to the dayroom and from the Pod control booth and/or had overheard the sounds of the fight occurring when they were within sufficient proximity to have responded promptly to halt the altercation before it escalated into full blown violence against Plaintiff.

50.     Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 knew or should have known that Plaintiff was injured, lying on the floor of the dayroom and that Plaintiff required medical attention.  None of Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 took any action to

summon medical care for Plaintiff. Instead, deputies began moving/acquiescing in the movement of Plaintiff's body around the dayroom, thereby permanently injuring Plaintiff's spine, delaying and denying Plaintiff the medical care he required and depriving Plaintiff of any possibility of recovering from his injuries.

51. The only medical staff to arrive in the dayroom and go near Plaintiff was Nurse Emeka, who did so only <u>after</u> deputies had already irreparably damaged Plaintiff's spine by moving/acquiescing in the movement of Plaintiff's body. Emeka was not a registered nurse, was not qualified or competent to provide any medical care to Plaintiff and claimed his only duties were to hand out pills to inmates during pill call. Emeka was not summoned to the dayroom to provide care for Plaintiff, nor did he provide any medical assessment or care to Plaintiff after his arrival in the dayroom. Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 all knew that Emeka lacked appropriate training, skills, or authority to provide adequate medical care to Plaintiff. Furthermore, said Defendants all witnessed Emeka failing to conduct any assessment of Plaintiff's condition or provide any care to Plaintiff after the incident. Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 all knew that at a bare minimum, the charge nurse on staff at the time of the incident should have been summoned to the dayroom to assess Plaintiff's medical

condition before anyone attempted to move Plaintiff's body, but none of said Defendants summoned the charge nurse, a doctor or another qualified medical professional.

52.   Defendant Bresyn stated in reports that he watched Dominguez and Bell lifting Plaintiff from the floor of the dayroom.  Defendant Bresyn also requested the wheelchair that was used to roll Plaintiff out of the 5A dayroom. In violation of training and jail policies and procedures, Defendant Bresyn agreed to move Plaintiff using a wheelchair rather than a backboard, and to move Plaintiff **before** he was evaluated by medical staff.  Defendant Bresyn rolled Plaintiff in the wheelchair down the 5th floor hallway to another room, rather than transporting him directly to the hospital.  Defendant Bresyn knew that transporting an inmate with a suspected spinal cord injury in a wheelchair violated POST and RPDC jail procedures and put the health and safety of Plaintiff at serious risk.  Nevertheless Defendant Bresyn participated in furthering Plaintiff's injuries by transporting Plaintiff in a wheelchair out of the dayroom rather than wait for medical staff to evaluate Plaintiff's condition.

53.   Defendant Stone, who was in charge of controlling the scene in the dayroom at the time of the incident, filed a report concerning the incident.  In his report, Stone stated that he saw Bell and Dominguez move Plaintiff from the floor of the dayroom.  Video shows that before Bell and Dominguez moved Plaintiff, he

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

still had use of his limbs and was not paralyzed.  After Bell and Dominguez moved Plaintiff, he was paralyzed from the neck down.  Stone reported that he told Bresyn to get a wheelchair.  Defendant Stone knew that transporting an inmate with a suspected spinal cord injury in a wheelchair violated POST and RPDC jail procedures and put the health and safety of Plaintiff at serious risk.  Nevertheless Defendant Stone personally participated in furthering Plaintiff's injuries by ordering Defendant Bresyn to transport Plaintiff in a wheelchair out of the dayroom and watching and approving as Bresyn rolled Plaintiff out of the dayroom in the wheelchair.  Additionally, Defendant Perez stated in his report that Stone told Bell and Dominguez to move Plaintiff onto his side.  Stone knew or should have known that moving Plaintiff's body around when he had an apparent head/neck injury could, and likely would, cause Plaintiff further spinal cord injury.  Nevertheless, Stone told deputies Bell and Dominguez to move Plaintiff's body.  All of this occurred before Plaintiff's medical condition was ever assessed by competent medical staff.

54.      Defendant Bell stated in his report that **"as I walked up to Manzo he was moving his upper body."** The County investigator who reviewed the video also confirmed that Plaintiff moved his upper body twice while lying on the floor of the dayroom.

55.      Defendant Bell stated in his report that when he encountered Plaintiff

on the floor of the dayroom that Plaintiff had blood on his face.

56.      Defendant Monzon also assisted Bell and Dominguez in trying to lift Plaintiff before any medical assessment was performed.  Monzon stated in his report that when he entered the dayroom, he saw that Plaintiff was "bleeding from his head."  Monzon stated in his report that he told Bell and Dominguez that Plaintiff had a "head injury".  At the time that Monzon told Bell and Dominguez about the head injury, plaintiff is informed and believes and based thereon alleges that Defendants Stone, Wedel, Toan, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 were also present and knew or should have known that Plaintiff had a head injury.  This was all known to Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 before Plaintiff received any medical assessment and should have immediately caused Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 to summon medical care, but they did not.

57.      Defendant Monzon stated after trying many times to lift Plaintiff that "Manzo appeared completely limp" and that Plaintiff told jail staff in the dayroom that he was paralyzed.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 were all present and heard Plaintiff say (after his body had been manhandled by deputies) that he

was paralyzed.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon,

Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 knew or should have

known that plaintiff had serious injuries that required immediate medical

attention, but none of them summoned medical care and did not give Plaintiff's

emergency condition the attention it deserved as required by their training and jail

policies and procedures.

58.     The conduct of Defendants Stone, Wedel, Toan, Bell, Dominguez,

Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 **was not intended**

**to provide medical care** to Plaintiff but only to move him out of the way.  The

conduct of Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn,

Griesinger, Mitchell, Perez and Does 1 to 100 caused injury and/or contributed to

further injury to Plaintiff's spine.

59.     Manzo was lying injured on the floor of Dayroom 1 of 5A awaiting

medical attention when Defendants Stone, Wedel, Toan, Bell, Dominguez,

Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 entered the

dayroom.  Defendants Bell, Dominguez and Monzon abruptly and roughly picked

up Manzo by his shirt with his head hanging freely, and rolled him on his back,

with his feet tucked underneath him in an awkward position.   Defendants Stone,

Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez,

Young, Cortez, Emeka and Does 1 to 100 made no attempt to follow basic

emergency medical services, protocols and guidelines in providing medical treatment to Manzo.  No cervical collar was placed on Manzo, nor was a backboard utilized to prevent damage to Manzo's spine.  It is clear from the video that Manzo still had use of his limbs immediately before deputies entered the dayroom.  Defendants Bell, Dominguez and Monzon manhandled Manzo several times trying to get him to sit up or stand.  While enduring this treatment, Manzo's limbs <u>immediately</u> went limp upon being picked up by his shirt by the deputies. Manzo was also conscious while lying on the floor of the dayroom and could have answered questions concerning his medical condition to staff if they had asked him before they moved his body.  Manzo specifically asked the deputies present to leave him on the floor *before* the deputies began trying to pick Manzo up. Instead, Defendants Bell, Dominguez and Monzon roughly, and improperly, picked Manzo up.  Plaintiff is informed and believes and based thereon alleges, that in manhandling Manzo's body in that manner, the deputies caused catastrophic injury to Manzo's spine rendering him a quadriplegic.  Video of the incident shows deputies trying numerous times to pick up Manzo only for Manzo to slump back awkwardly to the floor, clearly lacking any ability to move his four limbs after being roughly manhandled by the deputies.

60.     After being picked up by the deputies, Manzo then repeatedly informed deputies and nursing staff present that he was paralyzed, but Defendants

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

Toan, Wedel, Bell, Dominquez, Monzon, Bresyn, Stone, Griesinger, Mitchell,

Perez, Emeka, Young, Cortez and other currently unascertained deputies Does 1

to 100, nevertheless moved and/or failed to intercede in the movement of Manzo's

body out of the dayroom without using universally accepted spinal precautions or

standard emergency medical procedures.

61.     Plaintiff is informed and believes and based thereon alleges, that

Defendants Bell, Dominguez and Monzon were deputies who tried to pick up

Plaintiff prior to the arrival of medical help and without following standard

procedures or utilizing universal spinal precautions to protect Plaintiff from severe

spinal cord injury.

62.     Plaintiff is informed and believes and based thereon alleges, that

Defendants Toan, Bresyn, Stone, Wedel, Griesinger, Mitchell, Perez, Emeka,

Young and Cortez all witnessed Defendants Bell, Dominguez and Monzon

manhandling Plaintiff's body prior to the arrival of medical help and/or without

following standard procedures or utilizing universal spinal precautions to protect

Plaintiff from severe spinal cord injury and did nothing to intercede or stop the

movement of Manzo's body out of the dayroom.

63.     Defendants Toan, Emeka, Young, Cortez, Wedel, Bresyn, Stone,

Griesinger, Mitchell, Perez and other Riverside County sheriff's deputies, nursing

staff, and first responders on the scene and Does 1 to 100 (whose identities are

currently unascertained) all stood around watching Manzo's body be manhandled by the deputies.  All of the jail and medical staff on the scene ignored Manzo's serious medical needs.  All of the jail and medical staff on the scene failed to follow jail procedures in dealing with a medical emergency.  None of the staff called for a backboard or cervical collar.  Nor did any of the jail employees assess Manzo's medical condition first before trying to move his body.  Instead, after trying to have Manzo stand or sit on his own without success, jail staff then tossed Manzo into a wheelchair and wheeled him out of the dayroom.

64.     Manzo was then rolled, slumped over in the wheelchair down a hallway and into a medical room where he was kept by jail staff and jail medical staff in the wheelchair for approximately 30 minutes before he was transported by outside emergency medical technicians to the hospital for treatment of his severe spinal cord injuries.

65.     Once in the 5th floor hallway room, Defendant Toan interrogated Plaintiff for a period of almost 30 minutes.  While in that room, Defendants Emeka, Young and Cortez were also present and Plaintiff told Toan, Emeka, Young and Cortez that he was paralyzed.  Plaintiff was propped into sitting upright in a chair in the 5th floor hallway room in excess of 30 minutes.  Toan said during that time that Plaintiff was incoherent, mumbling and his head was "bobbing around". Plaintiff remained propped up in that sitting position for over

30 minutes with his blood pressure dropping and his body's blood flow being impaired and his oxygen saturation dropping precipitously.  Toan, Emeka, Cortez and Young all knew that Plaintiff's oxygen levels were dangerously dropping and that a drop in Plaintiff's oxygen levels endangered Plaintiff's health and safety. Still, Toan continued to interrogate Plaintiff for a lengthy period of time, while Emeka, Young and Cortez observed, without anyone making an effort to promptly summon medical care for Plaintiff.  Plaintiff eventually arrived at the hospital after a lengthy delay of one hour and 25 minutes.  The delay in transporting Plaintiff to the hospital caused further injury to Plaintiff, all of which was known or should have been known to Defendants Toan, Emeka, Young, Cortez, Wedel, Bresyn, Stone, Griesinger, Mitchell, Perez and Does 1 to 100.

66. None of the actions taken by Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 were for the purpose of providing medical care to Plaintiff, but were instead merely to transport Plaintiff out of the dayroom.

67. Throughout the entire time that Manzo's body was being manhandled by the deputies, Defendant Stone and Wedel, who were supervising sergeants, stood by with their hands in their pockets observing their subordinates failing to respond to Manzo's medical needs and taking no action themselves to discipline, intervene or otherwise stop the manhandling of Manzo's body and the infliction of

cruel and unusual punishment on Manzo.  Stone and Wedel, as supervising

sergeants were charged with the responsibility of overseeing and instructing the

deputies and medical staff in the dayroom.  Stone and Wedel were the decision-

makers in the dayroom and had absolute control over the actions of deputies and

jail medical staff in the dayroom throughout the incident and its aftermath.  Stone

and Wedel knew that Plaintiff required immediate medical care, that competent

medical care should be summoned immediately to assess Manzo's injuries and

that Manzo's body should not be moved until such time as Manzo is examined by

competent medical staff.  Nevertheless, Stone and Wedel did not take any action

to either instruct deputies to call for medical care or order medical care to the

scene themselves.  Stone and Wedel did not tell the deputies to stop moving

Plaintiff's body, despite them knowing that any movement could irreparably harm

Plaintiff's spinal cord.  Stone personally participated in orders directing

movement of Plaintiff's body prior to Plaintiff being evaluated by medical staff

and also made the decision for Plaintiff to be transported out of the dayroom in a

wheelchair.  Stone and Wedel could have, and should have, ordered the deputies

not to touch Plaintiff and to wait for competent medical staff to arrive.

68.     As a direct and proximate result of the jail and medical staff's failure

to use any spinal or medical precautions when extracting Manzo from the jail,

Manzo suffered catastrophic spinal cord injuries that have rendered him a

quadriplegic.  Manzo is no longer able to care for his own needs including, toileting, bathing and feeding.  Manzo suffers frequent, painful bedsores, bouts of pneumonia and will require 24-hour round the clock medical care and treatment for the remainder of his life.

69.     Throughout the entire period of Manzo's detainment by the Riverside County Sheriff's Department, Manzo displayed behavior consistent with possessing a serious mental health disorder such that he should have been evaluated, classified, and provided necessary mental health treatment appropriate for his condition, including, specialized housing to protect him from being threatened and attacked by other inmates.

70.     On information and belief, plaintiff further alleges that employees of the Riverside County Sheriff's Department and Robert Presley Detention Center failed to make timely inspections of the dayroom such that the beating of Manzo could have been prevented, or deputies could have intervened such that Manzo would not have sustained the injuries he sustained in the incident with Sanchez. Additionally, plaintiff alleges on information and belief that deputies assigned to monitor the dayroom were either not present or were not paying attention and failed to properly monitor the dayroom, including, failing to make visual inspections of the dayroom according to the jail's standard operating procedures.

71.     On information and belief, Plaintiff further alleges that employees of

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE No: 5:17-cv-1165-JGB-SP

the Riverside County Sheriff's Department and Robert Presley Detention Center

failed to administer prompt and adequate medical attention to Manzo which

directly caused Manzo to become quadriplegic and suffer severe, permanent,

harm.

72.     On February 18, 2015 - more than one year before the incident herein

involving Plaintiff David Manzo – a pre-trial detainee suffering from a mental

health condition by the name of Eddy Soriano was housed at RPDC on the same

mental health floor (5th Floor) as Plaintiff David Manzo was later housed.  At the

time of that prior February 18, 2015 incident, Defendants Stanley Sniff, William

Di Yorio, Jerry Gutierrez, Andrew Shouse, Stone, Christopher Wedel and other

presently unascertained employees of the County of Riverside (Does 1 to 100),

were employed with the County of Riverside Sheriff's department and charged

with the responsibility of supervising, and managing the Riverside County jails.

73.     On February 18, 2015 Mr. Soriano was severely beaten by his

cellmate on the 5th floor of RPDC and remains in a permanent vegetative state as

of the date this complaint is filed.  At the time of that incident, Riverside County

jail employees knew that inmates in the mental health floor of RPDC (5th floor)

were routinely violent toward other inmates and that fights break out between the

inmates on that floor with sufficient frequency that the safety of the other inmates

housed on that floor must be closely supervised and that precautions to avoid the

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE No: 5:17-cv-1165-JGB-SP

interaction of violent inmates with other inmates housed on the 5th floor of RPDC must be implemented and utilized for the safety and security of the inmates.  Due to the severity of the injuries suffered by Mr. Soriano, a large-scale investigation was conducted which involved reports issued to all County of Riverside supervising personnel, including, Defendants Sheriff Sniff, William Di Yorio, Jerry Gutierrez, Andrew Shouse, Stone, Christopher Wedel, and other presently unascertained employees of the County of Riverside (Does 1 to 100). Sheriff Sniff and Jerry Gutierrez were named as defendants in the lawsuit brought on behalf of Mr. Soriano against the County of Riverside.

74.   Following Mr. Soriano's attack, a crime analyst conducted a detailed investigation of inmate-on-inmate violence occurring at RPDC between February 2014 and March 2015.  The results of the investigation were compiled into a memorandum (hereafter "RPDC Crime Study").  The RPDC Crime Study revealed 208 reports of inmate-on-inmate battery incidents at RPDC spanning the approximate one year period between February 2014 and March 2015, with the 5th floor housing unit ranking the highest in inmate-on-inmate violence incidents resulting in injury.

75.   Plaintiff is informed and believes, and based thereon alleges that the RPDC Crime Study was circulated and reviewed by Defendants Sheriff Sniff, William Di Yorio, Jerry Gutierrez, Andrew Shouse, Stone, Christopher Wedel,

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

and other presently unascertained employees of the County of Riverside (Does 1 to 100) before Plaintiff David Manzo was attacked at RPDC.

76.     Plaintiff is informed and believes and based thereon alleges that the results of the RPDC Crime Study as well as the February 18, 2015 attack of Eddy Soriano by his cellmate were known or should have been known to Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100) prior to the date Plaintiff David Manzo was attacked.   Plaintiff alleges that both before and after David Manzo was attacked by inmates Sanchez and Lunsted, Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew or should have known that inmate-on-inmate violence on the 5th floor of RPDC was not only common, but frequent and often resulted in severe injuries or death.

77.     Plaintiff is informed and believes and based thereon alleges that despite the incident involving Mr. Soriano and despite the RPDC Crime Study statistics showing that the 5th floor of RPDC suffers from an inordinately high level of inmate-on-inmate violence, Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100): failed to take any action to increase or modify the level of supervision of inmates on the 5th floor of RPDC; failed to modify

classification policies and procedures to reduce or eliminate the inmate-on-inmate

violence that occurs on the 5th floor of RPDC in a manner that would ensure the

safety and security of the inmates housed on the 5th floor of RPDC; acquiesced to

the inmate-on-inmate violence occurring on the 5th floor of RPDC, and by

acquiescing to the inmate-on-inmate violence occurring at RPDC, thereby

endorsed, condoned, sanctioned, approved and furthered policies, procedures and

practices that were known to result in a violation of the rights of inmates to be free

from violence at the hands of other inmates and the rights of inmates to be free

from cruel and unusual punishment.

78.      Additionally, prior to Plaintiff's brutal attack, at least four

occurrences of inmate-on-inmate violence resulting in death or severe injuries at

other Riverside jail facilities have occurred.  Those occurrences include (a) the

severe beating of Vernon Vasquez on January 10, 2013; (b) the death of Julio

Negrete on May 9, 2013; (c) the severe beating of William Ray Espinoza on

November 14, 2013; and (d) the death of Robert Anthony Hearn on March 17,

2015.  Plaintiff is informed and believes and based thereon alleges that each of

those four occurrences were known to supervisory Defendants Sniff, Di Yorio,

Gutierrez, Shouse, Stone, and Wedel before the time Plaintiff was attacked.  All

four occurrences stemmed from County's policy, practice and custom of

overcrowding inmates, improperly classifying inmates, housing violent and

mentally unstable inmates together in cells, failing to follow standard operating procedures regarding performing visual inspections of inmates and inadequately monitoring and maintaining audio and visual monitoring systems.  Plaintiff is informed and believes and based thereon alleges that notwithstanding Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel's knowledge of the inmate-on-inmate violence occurring within Riverside County jails, no efforts were made by any of the foregoing supervisory defendants to modify jail policies and procedures regarding the supervision of inmates or implement policies and procedures for the jails that would increase the ratio of deputies to inmates at Riverside jails; train and re-train deputies in how to supervise inmates; and/or train and re-train deputies on segregating violent inmates from vulnerable inmates. By failing to identify and petition for policy changes and/or implement changes to reduce or eliminate the occurrence of inmate-on-inmate violence in the jails, Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel knew that inmates would continue to be attacked and injured in the County of Riverside's jail system.

79.     County of Riverside jail employees, including, but not limited to Defendants Sheriff Sniff, Undersheriff Di Yorio, Assistant Sheriff Jerry Gutierrez, Captain Andrew Shouse, Stone, Sergeant Christopher Wedel, Deputy Jonathan Toan, Defendants Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez,

37

and other presently unascertained employees of the County of Riverside (Does 1 to 100) all underwent Peace Officer Standards and Training ("POST") prior to working for the County of Riverside.  As part of the POST Training, all of the aforementioned defendants were trained in the POST "Victim Assessment" learning domain that more harm can be done by moving a victim than the original injury causing event.  POST training standards therefore state – DO NOT MOVE any injured victim unless absolutely necessary for scene safety, patient safety or officer safety.  POST training provides that only in cases of imminent danger (for example, exposure to fire, toxic gas, etc.) should an injured victim be moved. Additional POST training standards provide that if a victim must be moved because of imminent danger, then the officer should keep the victim in a straight line, keep the victim lying down and move the victim gently.  The POST training on "Basic Life Support" also provides that when dealing with suspected head, neck or back injuries, the injury may not always be obvious and therefore, brain and spinal cord damage should always be assumed by the officer.

80.     Under the Riverside County Sheriff's Department of Corrections Division Policy Manual ("Policy Manual"), Defendants Sheriff Sniff, Undersheriff Di Yorio, Assistant Sheriff Jerry Gutierrez, Captain Andrew Shouse, Stone and Sergeant Christopher Wedel, as supervisory officers, are responsible for providing first line supervision and for enforcing rules, regulations and policies

among members of their units.  Plaintiff is informed and believes, and based thereon alleges, that the Policy Manual was in effect at the time of this incident involving Plaintiff David Manzo and that all County of Riverside jail staff including, but not limited to Defendants Sheriff Sniff, Undersheriff Di Yorio, Assistant Sheriff Jerry Gutierrez, Captain Andrew Shouse, Stone, Sergeant Christopher Wedel, Deputy Toan, Defendants Emeka, Young, Cortez, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) reviewed and knew the contents of the Policy Manual prior to the date Plaintiff was injured.

81.    The Policy Manual also provides that the sheriff reviews the work of the unit to ensure compliance with departmental policies and standards.  The Policy Manual also provides that the assistant sheriff is to confer regularly with the sheriff on the implementation of policies, programs and procedures for the Sheriff's Department.  Plaintiff is informed and believes and based thereon alleges, that Defendant Sniff, in collaboration with his Chief of Staff, Defendant Di Yorio, reviewed the work of the unit to determine whether it was being operated in compliance with departmental policies and procedures before the October 25, 2016 incident with Manzo and, despite finding instances of the unit failing to comply with departmental policies and procedures, Defendant Sniff nevertheless approved the work of the unit, thereby condoning or endorsing the

procedural violations.

82.     Plaintiff is informed and believes that Defendants Di Yorio and Gutierrez conferred with Defendant Sniff on the implementation of policies, programs and procedures for the Sheriff's Department in RPDC prior to the date that Manzo was injured, but that despite conferring about the unit failing to comply with departmental policies and procedures, Defendants Sniff, Di Yorio and Gutierrez nevertheless approved the work of the unit, thereby condoning or endorsing the procedural violations.

83.     The Riverside County Sheriff's department is responsible for providing basic medical services to inmates in custody at all jails in the County under the U.S. Constitution, Penal Code section 6030 and CCR Title 15 section 3350, et seq.  The Sheriff has the ultimate responsibility under CCR Title 15, Article 11 section 1200 to provide medical services to inmates in accordance with certain guidelines.

84.     The Riverside County Field Operations Manual governs field operations within the Riverside County Sheriff's Department.  Pursuant to the Riverside County Field Operations Manual, only the Sheriff (Defendant Sniff) may approve Sheriff's Department policy, procedure, rules and regulations.  The Sheriff shall take charge of and keep the County jail and the prisoners in it.  As CEO of the Sheriff's Department, the sheriff must delegate and assign duties to

other Departmental personnel.

85.     Under the Sheriff's General Orders, Sergeants (Defendants Stone and Wedel) are supervisory officers and are responsible for providing first line supervision and for enforcing rules, regulations and policies among members of their units.  Sergeants are charged with duties to assign, direct and supervise the work of deputy sheriffs, as well as to enforce policies, procedures, rules, regulations and directives among members of their unit or section.  Supervisors are also required to ensure that members are adequately trained to perform their duties.  Supervisors shall conduct personnel inspections of their subordinates on a weekly basis to ensure compliance with department policies and procedures.

86.     The Sheriff's Captain (Defendant Shouse) is a Commander and is the top level of authority of a bureau or station and is responsible for its operation. The Sheriff's Captain plans, assigns, directs and supervises the work of all assigned law enforcement and clerical personnel, coordinates the work of the unit with others in the department and reviews the work of the unit to ensure compliance with department policy and standards.  Captains must ensure that all members within their command receive training necessary to perform their duties.

87.     The Assistant Chief to the Sheriff (Defendant Di Yorio) plans, directs, assigns and supervises the programs, procedures and personnel of a major functional division of the Sheriff's Department.  The Assistant Chief assists the

Sheriff in planning and developing all policies, programs and procedures of the Sheriff's Department, confers regularly with the Sheriff on the implementation of policies, programs, and procedures for the Department, recommends reorganizations as necessary and assists in the determination of Departmental needs in terms of program, personnel and equipment. The Assistant Chief also directs and evaluates investigations of public complaints pertaining to activities of employees of the Sheriff's Department, analyzes information and prepares reports, evaluates the performance of employees, the need for training of Department personnel, and personnel and equipment requirements.

88.     Sheriff's Department personnel are not permitted to commit or omit any acts which constitute a violation of the policies, procedures, rules or regulations of the Sheriff's Department and are charged with responsibility pursuant to the General Orders to report violations by other members.

89.     Sheriff Deputies are charged with the responsibility to perform all tasks with consideration for personal safety and the safety of others. All deputies must obey all federal and state laws, federal and California state constitutions and all appropriate local laws, ordinances and case law to ensure effective performance of their duties.

90.     The Sheriff's Department is required to adhere to the training requirements as set forth by the Commission on Peace Officers' Standards and

Training (POST).

91.     The Policy Manual relating to Inmate Medical Care provides that all persons detained in Riverside County correctional facilities shall be provided basic and emergency medical care and that corrections staff shall not interfere, delay, or deny an inmate's access to medical care.  Emergent and Urgent Care provisions of the Policy Manual provide that any corrections staff member who discovers, or is told of, an inmate requiring medical assistance shall make every effort to find out the nature of the medical problem and whether or not it is a medical emergency.  The Policy Manual provides that if it is an urgent or emergent medical condition, the staff member shall immediately notify central control, summon jail medical staff, and notify a sergeant.  The Policy Manual also provides that corrections staff shall provide appropriate and timely response to medical emergencies consistent with officer safety, the staff member's training and the use of universal precautions.

92.     Prior to working at the jail, all deputies, including the sergeants and captains must undergo training which includes the County of Riverside's policies regarding (a) monitoring inmates; (b) responding to events which could cause injury to inmates; and (c) training to summon medical care when an inmate appears to be in need of medical care.  All deputies are required to undergo at least 24 hours of advanced officer training every year, which focuses on the duties

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE No: 5:17-cv-1165-JGB-SP

of deputies and the County's policies and procedures concerning the County jails.

93.     Defendants Sniff, DiYorio, Gutierrez, Shouse, Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 were all charged and responsible for the supervision, care, security and safety of Plaintiff Manzo while he was housed at RPDC, and for ensuring that his constitutional and statutory rights were not violated.  It was the duty and responsibility of these Defendants to supervise, monitor and protect inmates under their supervision and control, to ensure inmates did not harm other inmates, to maintain safety and security in the jail, and to report deputy wrongful conduct that results in the infliction of violence against an inmate or the deprivation of an inmate's constitutional and statutory rights.

94.     At the time that Plaintiff David Manzo was injured on October 25, 2016, Sergeant Christopher Wedel, Defendant Stone, Deputy Jonathan Toan, Defendants Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) who were all present at the scene of the incident failed to comply with POST training standards and the Policy Manual by:  failing to notify central control before moving Plaintiff David Manzo; failing to summon jail medical staff before moving Plaintiff; failing to notify appropriate superiors before moving Plaintiff; failing to use universal precautions before moving Plaintiff; failing to perform

appropriate first aid until relieved by jail medical or local emergency medical services staff; failing to evaluate Plaintiff's condition to determine the correct course of action to take; by moving and/or supervising the movement of Plaintiff David Manzo when the other inmates were already back in their cells and there was no need to move Plaintiff before a proper medical assessment could be performed; by not keeping Plaintiff in a straight line and/or supervising deputies while Plaintiff was moved.

95.     County of Riverside's failure to summon and render adequate medical care to inmates housed in the County jails, including RPDC was previously addressed in a class action lawsuit brought on behalf of County of Riverside jail inmates entitled *Quinton Gray v. County of Riverside*, Case No.: EDCV 13-0444 VAP, and filed on March 8, 2013 in the United States District Court for the Central District of California.   In that case, County of Riverside entered a consent decree which was filed on June 7, 2016 wherein the County of Riverside agreed to implement remedial measures to address the failure to provide constitutionally adequate medical care to prisoners housed in County of Riverside jails.  The remedial plan included, among other requirements: that "all health care staff shall provide community standard of care" in their respective roles; that emergency procedures are to be provided "immediately"; and that in the event of a medical emergency, the inmate will be seen by health care staff at an RN level or

higher "as soon as possible".

96.     Plaintiff is informed and believes and based thereon alleges that Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100), knew or should have known about the Consent Decree in the *Gray v. County of Riverside* case prior to the time Plaintiff was injured.  Plaintiff further alleges on information and belief that Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew or should have known based on the Consent Decree that the County of Riverside was failing to provide minimally adequate medical and mental health care to the inmates incarcerated in Riverside County jails in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution as well as discrimination against certain inmates with disabilities in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

97.     County of Riverside, Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100) failed to implement the terms of the remedial plan set forth in the Consent Decree by failing to educate, train, supervise and oversee:  (a) that all of the existing jail staff knew what is required to provide "community standard of care";  and (b) that all jail staff knew how to recognize an emergency

1   and follow universally accepted emergency procedures and protocols when a

2   medical emergency occurs.

3

4       98.     By failing to implement the remedial plan set forth in the Consent

5   Decree, County of Riverside, Defendants Sniff, Di Yorio, Gutierrez, Shouse,

6   Stone, Wedel and other presently unascertained employees of the County of

7

8   Riverside (Does 1 to 100) knew or should have known that the rights of inmates in

9   the County of Riverside jail system to receive constitutionally adequate medical

10  care would be violated and that this deprivation of the inmates' rights would cause

11

12  severe injury or even death.

13

14      99.     Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel

15  knew, prior to Plaintiff being injured that RPDC was not in compliance with the

16

17  terms of the Consent Decree and that RPDC was grossly understaffed.

18  Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel knew prior to

19

20  Plaintiff being injured that jail staff at RPDC were also inadequately trained.

21  Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel knew, prior to

22

23  Plaintiff being injured, that existing jail staff had undergone inadequately

24  condensed training programs and that cheating on performance tests happened

25  frequently in the Sheriff's Department.  Plaintiff is informed and believes and

26

27  based thereon alleges that cheating within the Riverside County Sheriff's

28  Department was so prevalent that even after a 2015 internal affairs investigation

uncovered at least 25 employees attempting to cheat their way to a higher rank, none of the cheating employees were demoted or fired and some in fact received promotions. Plaintiff is informed and believes and based thereon alleges that Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel knew that by failing to bring Riverside jails into compliance with the Consent Decree, inmates' constitutional rights would continue to be violated. By failing to insist that jail staff undergo adequate, fully verified training, Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, and Wedel thereby condoned the conduct, essentially favoring compliance over competency – but achieving neither in the process.

100.    Had County of Riverside, Defendants Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100) implemented the terms of the Remedial Plan and adequately supervised the jail staff, Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mithcell, Perez, Emeka, Young, Cortez and other presently unascertained employees of the County of Riverside (Does 1 to 100) would not have moved Plaintiff's body prior to the arrival of medical staff or EMS and/or would not have failed to intervene in the movement of Plaintiff's body in a manner that violates the Policy Manual, Consent Decree and POST standards.

## **DAMAGES**

101.   As a proximate result of Defendants' conduct, Plaintiff David Manzo suffered permanent paralysis of his four limbs resulting in pain and suffering, past and future medical expenses, past and future wage loss, and past and future lost earning capacity.

102.   Plaintiff has found it necessary to engage the services of counsel to vindicate his rights under the law.  Plaintiff is therefore entitled to an award of all attorneys' fees and litigation costs incurred in pursuing this action for violation of civil rights.

## First Claim

**Violation of 42 U.S.C. §1983**
**Deliberate Indifference to Serious Medical Needs**
**By David Manzo against Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unscertained employees of the County of Riverside (Does 1 to 100)**

103.   Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-102 of this complaint.

104.   On October 25, 2016, Manzo had a serious medical need in that he had been injured in a fight with a known, violent inmate and was lying on the floor of Dayroom 1, 5A requiring medical attention.

105.   Manzo, as a pretrial detainee had a constitutional right under the 14th Amendment to receive medical care and to be free from cruel and unusual punishment under the due process clause of the 14th Amendment.

49

106.    Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) violated Manzo's constitutional right to medical care when they acted with deliberate indifference to Manzo's serious medical needs by failing to promptly summon medical care when it was evident Manzo had an immediate need for medical care and by improperly manhandling Manzo's body from the floor without using any universally accepted spinal or medical precautions.

107.    At all times, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) were acting under color of law and were acting in the course and scope of their employment with County of Riverside.

108.    At all times, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew that Manzo had a serious medical need.

109.    At all times, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100),

failed to take reasonable action to summon immediate medical care; failed to provide appropriate assessment and evaluation of Manzo's injuries; failed to follow basic, universally accepted emergency medical protocols; failed to follow Riverside County Sheriff standard emergency medical procedures and policies, as well as POST training procedures; failed to provide adequate observation and medical intervention for Manzo's serious medical needs; seriously aggravated Manzo's medical condition by authorizing and/or participating in the moving, dragging, and careless manipulation of Manzo's body after he suffered serious injuries; delayed in providing appropriate care and treatment of Manzo's injuries and interfered with Manzo receiving appropriate medical treatment, all of which deprived Manzo of his constitutional right to receive medical care and to be free from cruel and unusual punishment.

110.     At all times, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew or should have known that by failing to stabilize Manzo's spine prior to moving his body out of the jail, Manzo could and would suffer severe spinal cord injuries, including, paralysis, and that it would cause Manzo unnecessary and wanton infliction of pain.  When Defendants extracted Manzo from the jail floor, they moved his body without spinal or medical precautions, attempting to lift him

up at least five (5) times without success and eventually, transported him out of the jail only in a wheelchair.  <u>All of this conduct was done before Plaintiff had ever received a medical assessment and the failure to provide a medical assessment *first*, before moving Plaintiff, interfered with, delayed and denied Plaintiff constitutionally adequate medical care and was a direct and proximate cause of Plaintiff being rendered a quadriplegic.</u>

111.    Throughout the entire time deputies were manhandling Manzo's body, Defendant Wedel, and Defendant Stone, as supervising sergeants, stood by with their hands in their pockets, and did nothing to discipline, instruct, intervene or stop the conduct of their subordinates from causing further, catastrophic, permanent injury to Manzo, despite knowing that Manzo had a serious and immediate medical need.

112.  Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) were deliberately indifferent to Manzo's serious medical needs.

113.  Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) intentionally or with reckless disregard, denied, delayed, and/or interfered with Manzo's receipt

of medical care.

114.   Defendants Wedel, Stone, Toan, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) failed to properly conduct safety checks of the dayroom to verify an inmate's safety and welfare.

115.   Defendant Toan admitted in declarations in support of arrest warrants for inmates Sanchez and Lunsted that he saw inmates Sanchez and Lunsted "attacking" Plaintiff David Manzo. Plaintiff is informed and believes and based thereon alleges that Defendant Toan witnessed the entire attack of Manzo by inmates Sanchez and Lunsted, which went on for several minutes.  Defendant Toan did nothing to stop the threatening conduct being made by inmate Sanchez against Plaintiff before it escalated into full-blown physical violence against Plaintiff David Manzo.  Both inmates Sanchez and Lunsted began punching Plaintiff and Defendant Toan watched it happen.  Defendant Toan witnessed Plaintiff being punched in the *head* several times by both inmates Sanchez and Lunsted, yet, Defendant Toan did not promptly summon medical care to assess Plaintiff's head injuries.  Defendants Wedel, Stone, Bell, Dominguez, Monzon, Bresyn Griesinger, Mitchell, Perez and Does 1 to 100 all knew or should have known that the fight was occurring and that Plaintiff had been hit in the head several times and required medical attention.  Had Defendants Toan, Wedel,

Stone, Bell, Dominguez, Monzon, Bresyn Griesinger, Mitchell, Perez and Does 1 to 100 intervened to stop the threatening conduct exhibited by other inmates against Plaintiff prior to the situation escalating into physical violence against Plaintiff, Plaintiff would not have suffered head injuries from being punched in the head several times by two inmates and Plaintiff would not have suffered even more significant bodily injury by being taken to the ground by inmate Sanchez. Defendants Toan, Wedel, Stone, Bell, Dominguez, Monzon, Bresyn Griesinger, Mitchell, Perez and Does 1 to 100 acted with deliberate indifference to Plaintiff's serious medical needs both at the time they saw Plaintiff being punched in the head by two other inmates repeatedly and when they saw inmate Sanchez take Plaintiff to the ground causing further serious bodily injury to Plaintiff and when they saw that Plaintiff had a head injury immediately after entering the dayroom.

116.    As a direct and proximate result of the foregoing acts and omissions that were deliberately indifferent to Manzo's serious medical needs, Manzo suffered severe harm in that he was rendered a quadriplegic during his extraction from the jail.

117.    As a further direct and proximate result of the foregoing conduct, Manzo suffered physical pain, severe emotional distress, and mental anguish. Manzo is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical care and treatment for

the remainder of his life.

118.    The conduct alleged herein was done in deliberate or reckless disregard of Manzo's constitutionally protected rights, justifying an award of exemplary damages against Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) in an amount according to proof at the time of trial in order to deter Defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Manzo is also entitled to attorney fees and costs of suit herein.

## Second Claim

**Violation of 42 U.S.C. §1983**
**Failure to Protect & Cruel and Unusual Punishment – 14th Amendment**
**By David Manzo against Defendants Wedel, Stone, Toan, Bell, Dominquez,**
**Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently**
**unascertained employees of the County of Riverside (Does 1 to 100)**

119.    Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-118 of this complaint.

120.     Manzo was incarcerated at RPDC under conditions that posed a substantial risk of serious harm to his health and safety, which were known to Defendants Wedel, Stone, Toan, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100). Such conditions included:

(a)  Placing Manzo, who suffered from mental health conditions, including schizophrenia, in a dayroom where Defendant Sanchez could interact with him.  Defendant Sanchez was a known, violent inmate who had inflicted violence upon other inmates multiple times prior to the date that he attacked Manzo;

(b)  Failing to assign sufficient Sheriff's deputies to the RPDC in order to provide adequate monitoring and supervision of the inmates;

(c)  Causing and permitting the RPDC to be overcrowded, which contributed to causing inmate on inmate violence;

(d)  Failing to properly train the Sheriff's deputies assigned to the RPDC so that the deputies did not have sufficient knowledge or skills to adequately monitor and supervise the inmates;

(e)  Failing to follow standard operating procedures regarding the performance of physical visual inspections of the dayrooms at RPDC;

(f)  Placing Manzo in the dayroom with other inmates under circumstances which were conducive to the eruption of violence; and

(g)  Failing to timely intervene to stop the attack by Defendants Sanchez and Lunsted against Manzo.

121.    Defendants Wedel, Stone, Toan, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees

of the County of Riverside (Does 1 to 100), had ample and reasonably sufficient time and opportunity to intervene and prevent Manzo's injuries, and were compelled to do so as Sheriff's deputies under the laws of the State of California and under the Constitution of the United States of America.

122.     In deliberate indifference to the life and welfare of Manzo, each said Defendant intentionally and with deliberate indifference to the civil rights of Manzo, refrained from intervening in the acts leading to Manzo's injuries.

123.     In doing the acts complained of, Defendants Wedel, Stone, Toan, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100), acted under the color of state law to deprive Manzo of certain constitutionally protected rights including, but not limited to, the right not to be deprived of life or liberty without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution, the right to be free from violence at the hands of another inmate and the right to be free from cruel and unusual punishment under the due process clause of the Fourteenth Amendment to the U.S. Constitution.

124.     The above acts and omissions, while carried out under color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive and unrelated to any activity which governmental

officers may appropriately and legally undertake in the course of protecting

persons or property or ensuring civil order.

125.    In acting or failing to act as hereinabove alleged, the

aforementioned Defendants were deliberately indifferent to the substantial risk

that Sanchez would assault and severely injure Manzo.

126.    As a proximate result of the aforementioned wrongful conduct,

Manzo suffered injuries and damages as set forth herein, including, being

rendered a quadriplegic.

127.    The conduct of Defendants Wedel, Stone, Toan, Bell, Dominquez,

Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained

employees of the County of Riverside (Does 1 to 100), was intentional, malicious,

willful, wanton and in reckless disregard of Manzo's constitutional rights and/or

grossly negligent in that this conduct shocks the conscience and is fundamentally

offensive to a civilized society, so as to justify the imposition of punitive damages

against each of the foregoing individual respondents.

### Third Claim

**Violation of 42 U.S.C. §1983**
**Failure to Properly Train**
**By David Manzo against Defendants County of Riverside, Sniff, Di Yorio,**
**Gutierrez, Shouse, Wedel, Stone and other presently unascertained**
**supervisory employees of the County of Riverside (Does 1 to 100)**

128.    Plaintiff David Manzo realleges and incorporates by reference

paragraphs 1-127 of this complaint.

129.   This claim is brought pursuant to 42 USC § 1983 for violation of plaintiff's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

130.   Defendant Sniff, as Sheriff of Riverside County is responsible, by law for inmate safety and is answerable for an inmate's safekeeping, including Plaintiff Manzo.  Sniff is also charged by law and is responsible for the administration of the Riverside County Sheriff's Department and its employees and for supervision, training and hiring of persons, agents and employees working for the Riverside County Sheriff's Department.  Sniff is sued in his personal/individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, or for his acquiescence in the constitutional deprivations alleged herein.  Sniff's affirmative conduct involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which he knew or reasonably should have known would cause others to inflict the constitutional injuries alleged herein.

131.   Sniff knew, or reasonably should have known of his subordinates' ongoing constitutional violations, of the failure to provide reasonable security at RPDC, the failure to prevent inmate on inmate violence, the failure to monitor inmates, lax or no supervision by his subordinate supervisors, failure to

investigate incidents involving inmate-on-inmate violence, failure to implement policies and procedures regarding how deputies are to handle situations involving injured inmates after an inmate-on-inmate attack, in particular, failing to implement and ensure compliance with the procedure that injured inmates are not to be moved before jail medical staff have assessed the injured inmate's condition. Sniff acquiesced, condoned or ratified a custom, practice or policy of ongoing misconduct by his subordinate deputies and supervisors.

132.   Defendants Di Yorio, Gutierrez, Shouse, Wedel and Stone all have supervisory responsibilities with the Riverside County Sheriff's Department and were charged by law and were responsible for the administration of RPDC, its deputies, for training and supervising officers and deputies of RPDC, for ensuring compliance with department policies and procedures and enforcing department policies and procedures.  Defendants Di Yorio, Gutierrez, Shouse, Wedel and Stone are sued based on their personal/individual actions or inactions in the training, supervision, or control of their subordinates, or for their acquiescence in the constitutional deprivations alleged herein with respect to the inmates at RPDC, including Plaintiff, for whom they were charged to provide security and safety. Defendants Di Yorio, Gutierrez, Shouse, Wedel and Stone failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which they knew or reasonably should have known would cause others to

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

inflict constitutional injury on Plaintiff.

133.   Plaintiff is informed and believes and based thereon alleges that prior to the incident alleged herein, Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known, based on the high number of inmate-on-inmate attacks occurring at RPDC on the 5th floor, which were reported to them, that deputies at RPDC were not fulfilling their duties in supervising inmates and ensuring the protection of inmates from violence at the hands of other inmates. Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known that if they did not take action to train and re-train deputies regarding their duties to protect inmates, that additional constitutional violations would occur and additional inmates, like Plaintiff, would suffer serious bodily injuries.  Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known that if they did not take action to ensure all deputies were complying with jail policy not to move an injured victim before medical staff assess the victim's injuries, then additional constitutional violations to inmates would occur.  Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known from the Crime Study (approximately 200 reported instances of inmate-on-inmate violence within a one year period) that RPDC's 5th floor required deputies to maintain greater supervision of inmates due to their proclivity for violence and that the mental health condition of certain inmates (like Plaintiff) increased the vulnerability of

inmates housed on the 5th floor allowing them to be the target of attacks by other

violent inmates.  Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or

should have known that by training and re-training deputies regarding performing

frequent safety checks, dayroom inspections to watch for threatening

conduct/behavior by inmates and segregating violent inmates from vulnerable

inmates, violence on the 5th Floor of RPDC could be eliminated and the safety and

security of inmates housed on the 5th floor would be ensured.  Rather than re-train

deputies or implement new policies and procedures for supervising inmates on the

5th floor of RPDC, Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone

acquiesced in the manner in which safety checks, dayroom inspections and

housing classification and interaction of inmates at the jail were being performed.

Said Defendants also condoned, by ignoring and failing to report jail staff who

were taking condensed training sessions in violation of jail policy and/or cheating

on performance tests -with the knowledge that inadequate training would render

jail staff incompetent and unable to properly carryout their duties to protect

inmates.  By their inaction in training and re-training deputies, Sniff, Di Yorio,

Gutierrez, Shouse, Wedel and Stone allowed constitutional deprivations to

continue.  Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone's inaction in

training and re-training deputies led to the very type of constitutional deprivations

plaintiff suffered here, namely, had Sniff, Di Yorio, Gutierrez, Shouse, Wedel and

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

Stone trained and re-trained deputies on conducting more frequent safety inspections, dayroom inspections and monitoring/segregation of violent inmates from vulnerable inmates, Plaintiff would not have been attacked by Sanchez and Lunsted; the attack would have been halted before it escalated into full-blown violence; Plaintiff's head injury from being punched by inmates Sanchez and Lunsted would have been discovered and medical care provided to Plaintiff before Sanchez took Plaintiff to the ground; and Plaintiff would not have suffered paralysis when deputies picked him up before medical staff examined Plaintiff's condition.

134.    As a direct and proximate result of Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone's failure to train and re-train, Plaintiff was seriously injured and suffered damages in an amount to be proven at trial.    Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone's inaction to train or re-train deputies is acquiescence to the unconstitutional conduct of lower level employees and constitutes a custom and practice and was the moving force behind Plaintiff's injuries, all of which evidences a policy of deliberate indifference on the part of Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone to their deputies' misconduct.

135.    Defendant County, based on the Crime Study which was reported to the County through its individual employees, and based on the *Gray* lawsuit and

the *Soriano* lawsuit in which County was a named defendant, knew, or should

have known that its training programs were inadequate and were failing to correct

repeated constitutional violations of inmates' rights at RPDC, in particular that

deputies were failing to protect inmates from violence at the hands of other

inmates and that deliberate indifference to the medical needs of inmates occurred

with frequency, causing substantial harm to inmates housed in the County jails.

Based on the prior reported instances of violence and lack of adequate medical

care, it was obvious to the County that changes in training and re-training were

necessary to avoid further constitutional violations.  Despite having notice of these

repeated constitutional violations of inmates' rights, County took no action to train

or re-train supervisors and their lower level employees in how to protect an inmate

from violence or how an injured victim's body should be handled so as to avoid

delayed or denied access to medical care when an inmate is in serious need of

medical attention.  The many instances of prior violence at RPDC (200+ cases in a

one year time span) and certification of a class of inmates housed in County jails

alleging deliberate indifference to medical needs evidences a pattern of

misconduct, all of which was known, or should have been known by County prior

to Plaintiff's incident.  County's policy of inaction in light of the notice it had

regarding its defective or improperly implemented programs is the functional

equivalent of a decision/policy/custom/practice of the County to violate the

constitutional rights of inmates housed in County jails.  County disregarded the likelihood that more inmates would be injured by taking no action to train or re-train jail staff in ways in which to protect inmates from violence at the hands of other inmates and/or responding to the medical needs of injured inmates. County's policy of inaction on these issues amounts to deliberate indifference to the constitutional rights of inmates housed in County's jails, including Plaintiff's constitutional rights.

136.   Had County taken action to train or re-train its staff regarding protection of inmates, conducting more frequent safety checks, dayroom inspections, segregation of violent inmates from vulnerable inmates and the appropriate way to handle the bodies of injured inmates in a manner consistent with POST training and the stated policies of the County jails, Plaintiff's injuries would not have occurred. County acted with deliberate indifference in failing to train or re-train employees, knowing that its failure to do so would result in more constitutional deprivations.

137.   As a direct and proximate result of County's inadequate training and its failure to train and re-train employees of the Riverside County Sheriff's Department, Plaintiff was seriously injured and suffered damages in an amount to be proven at trial.

138.     Defendants County of Riverside, Sniff, Di Yorio, Gutierrez,

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

Shouse, Wedel, Stone and other presently unascertained employees of the County

of Riverside (Does 1 to 100) acting under color of law, have subjected Manzo and

other persons similarly situated to a pattern of conduct consisting of continuing,

widespread and unconstitutional misconduct in violation of Manzo's Fourth

amendment and 14th amendment due process rights.  Defendants County of

Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently

unascertained employees of the County of Riverside (Does 1 to 100), while acting

under color of law, have failed to maintain adequate and proper training necessary

to educate deputies and medical staff as to the Constitutional rights of inmates; to

prevent the consistent and systematic failure to provide medical care; and to train

their deputies properly on basic medical procedures, emergency procedures,

welfare or cell checks. There has been an official policy of acquiescence in the

wrongful conduct.  Defendants County of Riverside, Sniff, Di Yorio, Gutierrez,

Shouse, Wedel, Stone and other presently unascertained employees of the County

of Riverside (Does 1 to 100), have failed to promulgate corrective policies and

regulations in the face of repeated constitutional violations like the failure to

provide constitutionally adequate medical care to inmates as set forth in the

*Quinton Gray v. County of Riverside* case and like the failure to protect inmates

from violence at the hands of other inmates as occurred in the *Eddy Soriano v.*

*County of Riverside* case and the 208 instances of inmate-on-inmate violence

analyzed in the RPDC Crime Study.

139.    Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), have also failed to supervise and insure that deputies fulfill their full 12 hours of advanced officer medical training, instead allowing condensed versions of the classes, and allowed deputies and trainers to sign under penalty of perjury that they completed their full 12 hour classes and passed their exams when Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), knew, or should have known, that deputies had not complied with their medical training requirements and that the lack of medical training would result in violations of the civil rights of inmates to receive constitutionally adequate medical care.

140.    Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), have acted with deliberate indifference in disregarding their duty to protect the public from official misconduct.  The failure to promulgate or maintain and ensure compliance with constitutionally adequate training as required by POST ("Peace Officer Standards and Training") certification was done with deliberate indifference to the rights of Manzo and

others in his position.  Despite their knowledge of previous instances of inadequate and improper medical responses to serious medical needs of inmates housed in the Riverside County jail system, Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), failed to properly train or retrain their deputies and medical staff to prevent serious harm to inmates and acquiesced in, and ratified, insufficient medical training of the deputies, knowing that such inadequate training put the health and safety of inmates at RPDC in jeopardy.  The foregoing defendants knew or it should have been obvious that inadequate training would result in the deprivation of Manzo's 14th amendment right to due process.

141.   Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew that the policies they had implemented with respect to medical care of inmates suffering from serious injuries was grossly inadequate.  Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew there were disproportionately high levels of inmate-on-inmate violence occurring in Riverside County jails and the 5th floor of RPDC in particular.  Defendants County of Riverside, Sniff, Di Yorio, Gutierrez,

Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) acted with deliberate indifference in failing to implement policies with respect to evaluation and treatment of inmates suffering from severe injuries and in failing to implement policies that would reduce or eliminate the chronic, frequent inmate-on-inmate violence occurring on the 5th floor of RPDC.

142.   Defendants Toan, Bell, Dominguez, Monzon, Emeka, Young, Cortez, Bresyn, Griesinger, Mitchell, Perez and presently unascertained employees of the County of Riverside (Does 1 to 100) acted under the direction and supervision of Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), who set forth the standards, policies and procedures on treatment of inmates and protection of inmates.

143.   At the time of the incident, Defendants Toan, Stone, Wedel, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 all moved or acquiesced in the movement of Plaintiff's body when he was laying injured on the jail floor, bleeding from his head.  The aforementioned ten (10) defendants all reacted similarly to Plaintiff's medical emergency by not following policies and procedures by moving and/or acquiescing in the movement of Plaintiff's body prior to the arrival of jail medical staff, thereby causing and/or

contributing to Plaintiff's catastrophic spinal cord injury.  The fact that all 10 jail staff reacted similarly is clear evidence that there is a systemic problem in the manner in which they have all been trained to respond to medical emergencies involving injured inmates.   Despite the fact that all deputies at the jail must be trained in how to summon medical care and how to respond to events which cause injury to inmates (like inmate-on-inmate violence) not a single one of the 10 jail staff on scene - both immediately before and after Plaintiff was taken to the ground by Sanchez – properly followed and carried out the jail procedure that required them <u>not</u> to move Plaintiff's body until he was assessed by medical staff.

144.   The foregoing lack of adequate training was done with deliberate indifference and caused Manzo harm at the hands of Defendants Toan, Bell, Dominguez, Monzon, Emeka, Young, Cortez, Bresyn, Griesinger, Mitchell, Perez and presently unascertained employees of the County of Riverside (Does 1 to 100) when they man-handled Manzo's body and/or failed to intervene to stop the manhandling of Manzo's body without the use of universally accepted emergency medical protocols and spinal precautions, thereby rendering Manzo a quadriplegic.

145.   As a result of Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) failure to train, the foregoing defendants

were deliberately indifferent to Manzo's medical needs.

146.   As a direct and proximate result of the actions of Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), Manzo suffered unconstitutional treatment and inhumane conditions while in RPDC as well as significant physical and psychological injuries.  Manzo is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical care and treatment for the remainder of his life.

<u>**Fourth Claim**</u>

**Violation of 42 U.S.C. §1983**
**Failure to Supervise**
**By David Manzo against County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Stone, Wedel and other presently unascertained employees of the County of Riverside (Does 1 to 100)**

147.   Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-146 of this complaint.

148.   This claim is brought pursuant to 42 USC § 1983 for violation of plaintiff's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

149.   Defendant Sniff, as Sheriff of Riverside County is responsible, by law for inmate safety and is answerable for an inmate's safekeeping, including Plaintiff Manzo.  Sniff is also charged by law and is responsible for the

administration of the Riverside County Sheriff's Department and its employees

and for supervision of agents and employees working for the Riverside County

Sheriff's Department.  Sniff is sued in his personal/individual capacity for his own

culpable action or inaction in the supervision or control of his subordinates, or for

his acquiescence in the constitutional deprivations alleged herein.  Sniff's

affirmative conduct involves his failure to ensure enforcement of policies, rules,

or directives that set in motion a series of acts by others which he knew or

reasonably should have known would cause others to inflict the constitutional

injuries alleged herein.

150.   Sniff knew, or reasonably should have known of his subordinates'

ongoing constitutional violations, of the failure to provide reasonable security at

RPDC, the failure to prevent inmate on inmate violence, the failure to monitor

inmates, lax or no supervision by his subordinate supervisors, failure to

investigate incidents involving inmate-on-inmate violence, failure to implement

policies and procedures regarding how deputies are to handle situations involving

injured inmates after an inmate-on-inmate attack, in particular, failing to

implement and ensure compliance with the procedure that injured inmates are not

to be moved before jail medical staff have assessed the injured inmate's condition.

Sniff acquiesced, condoned or ratified a custom, practice or policy of ongoing

misconduct by his subordinate deputies and supervisors.

151.   Defendants Di Yorio, Gutierrez, Shouse, Wedel and Stone all have supervisory responsibilities with the Riverside County Sheriff's Department and were charged by law and were responsible for supervising officers and deputies of RPDC, for ensuring compliance with department policies and procedures and enforcing department policies and procedures.  Defendants Di Yorio, Gutierrez, Shouse, Wedel and Stone are sued based on their personal/individual actions or inactions in the supervision or control of their subordinates, or for their acquiescence in the constitutional deprivations alleged herein with respect to the inmates at RPDC, including Plaintiff, for whom they were charged to provide security and safety.  Defendants Di Yorio, Gutierrez, Shouse, Wedel and Stone failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which they knew or reasonably should have known would cause others to inflict constitutional injury on Plaintiff.

152.   Plaintiff is informed and believes and based thereon alleges that prior to the incident alleged herein, Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known, based on the high number of inmate-on-inmate attacks occurring at RPDC on the 5th floor, which were reported to them, that deputies at RPDC were not fulfilling their duties in supervising inmates and ensuring the protection of inmates from violence at the hands of other inmates. Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known

that if they did not take action to properly supervise deputies regarding their duties to protect inmates, that additional constitutional violations would occur and additional inmates, like Plaintiff, would suffer serious bodily injuries. Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known that if they did not take action to supervise and ensure all deputies were complying with jail policy not to move an injured victim before medical staff has assessed the victim's injuries, then additional constitutional violations to inmates would occur. Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known from the Crime Study (approximately 200 reported instances of inmate-on-inmate violence within a one year period) that RPDC's 5th floor required deputies to maintain greater supervision of inmates due to their proclivity for violence and that the mental health condition of certain inmates (like Plaintiff) increased the vulnerability of inmates housed on the 5th floor to be the target of attacks by violent inmates. Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone knew, or should have known that by closely supervising deputies regarding their safety checks, dayroom inspections, and supervising the deputies' duties to segregate violent inmates from vulnerable inmates, violence on the 5th Floor of RPDC could be eliminated and the safety and security of inmates housed on the 5th floor would be ensured. Rather than adequately supervise deputies or implement new policies and procedures for having deputies supervise inmates on the 5th floor of RPDC,

74

Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone acquiesced in the manner in which safety checks, dayroom inspections and housing classification and interaction of inmates at the jail were being performed.  By their inaction in supervising deputies, Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone allowed constitutional deprivations to continue.  Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone's inaction in supervising deputies led to the very type of constitutional deprivations plaintiff suffered here, namely, had Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone supervised deputies to ensure frequent safety inspections, dayroom inspections and monitoring/segregation of violent inmates from vulnerable inmates was occurring, Plaintiff would not have been attacked by Sanchez and Lunsted; the attack would have been halted before it escalated into full-blown violence; Plaintiff's head injury from being punched by inmates Sanchez and Lunsted would have been discovered and medical care provided to Plaintiff before Sanchez took Plaintiff to the ground; and Plaintiff would not have suffered paralysis when deputies picked him up before medical staff examined Plaintiff's condition.

153.   As a direct and proximate result of Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone's failure to supervise, Plaintiff was seriously injured and suffered damages in an amount to be proven at trial.  Stone was also physically present when deputies were moving Plaintiff's body before Plaintiff had been

75

assessed by medical staff and arranged for the wheelchair to transport Plaintiff out of the dayroom, knowing that POST and jail policies required that Plaintiff's body not be moved, and if moved, should only be moved in a straight line to avoid spinal cord injury. Stone failed in performing his supervisory duties at the scene by acquiescing in the deputies' conduct. Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone's inaction to supervise deputies is acquiescence in the unconstitutional conduct of lower level employees and constitutes a custom and practice and was the moving force behind Plaintiff's injuries, all of which evidences a policy of deliberate indifference on the part of Sniff, Di Yorio, Gutierrez, Shouse, Wedel and Stone to their deputies' misconduct.

154. Defendant County, based on the Crime Study which was reported to the County through its individual employees, and based on the *Gray* lawsuit and the *Soriano* lawsuit in which County was a named defendant, knew, or should have known that it needed to increase supervision of deputies by supervisors and that current levels of supervision were inadequate and were failing to correct repeated constitutional violations of inmates' rights at RPDC, in particular that deputies were failing to protect inmates from violence at the hands of other inmates and that deliberate indifference to the medical needs of inmates occurred with frequency, causing substantial harm to inmates housed in the County jails. Based on the prior reported instances of violence and lack of adequate medical

care, it was obvious to the County that changes in employee supervision policies were necessary to avoid further constitutional violations.  Despite having notice of these repeated constitutional violations of inmates' rights, County took no action to supervise lower level employees and/or direct the supervision of employees in how to protect an inmate from violence or how an injured victim's body should be handled so as to avoid delayed or denied access to medical care when an inmate is in serious need of medical attention.  The many instances of prior violence at RPDC (200+ cases in a one year time span) and certification of a class of inmates housed in County jails alleging deliberate indifference to medical needs evidences a pattern of misconduct, all of which was known, or should have been known by County prior to Plaintiff's incident.  County's policy of inaction in light of the notice it had regarding its defective supervision or improperly implemented programs is the functional equivalent of a decision/policy/custom/practice of the County to violate the constitutional rights of inmates housed in County jails.  County disregarded the likelihood that more inmates would be injured by taking no action to supervise jail staff in ways in which to protect inmates from violence at the hands of other inmates and/or responding to the medical needs of injured inmates.  County's policy of inaction on these issues amounts to deliberate indifference to the constitutional rights of inmates housed in County's jails, including Plaintiff's constitutional rights.  Had County taken action to properly

77

supervise its staff regarding protection of inmates, conducting more frequent

safety checks, dayroom inspections, segregation of violent inmates from

vulnerable inmates and the appropriate way to handle the bodies of injured

inmates in a manner consistent with POST training and the stated policies of the

County jails, Plaintiff's injuries would not have occurred.

155.   County acted with deliberate indifference in failing to supervise

employees, knowing that its failure to do so would result in more constitutional

deprivations.  As a direct and proximate result of County's inadequate supervision

of employees of the Riverside County Sheriff's Department, Plaintiff was

seriously injured and suffered damages in an amount to be proven at trial.

156.   Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse,

Wedel, Stone and other presently unascertained employees of the County of

Riverside (Does 1 to 100) failed to adequately train, supervise, discipline or in any

way control all of the individually named defendant-officers and Does 1 to 100,

inclusive, in the exercise of their duties as officers, sergeants, commanders and/or

supervisors.

157.   County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel,

Stone and other presently unascertained employees of the County of Riverside

(Does 1 to 100) knowingly and deliberately fostered, maintained and condoned a

policy, practice and custom or otherwise acted in a manner that was deliberately

indifferent to the lives and liberty of persons such as David Manzo and that such policy, practice, custom and/or actions were a direct and legal cause of his injuries and damages.  The policy, practice, custom and actions included, without limitation, knowingly and deliberately failing to properly train, discipline and supervise employees regarding detentions, apprehension, use of force, detention and apprehension of persons with mental health issues and disabilities, control and supervision over inmates with known violent tendencies, and recognizing and attending to inmates with serious medical needs in a manner that does not delay or deny access to constitutionally adequate medical care.

158.   Plaintiff is informed and believes and based thereon alleges that County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) learned and became aware of the excessive force used against David Manzo and his attack by other inmates within the jail, as well as his lack of access to medical care and the interference by deputies in getting David Manzo medical care when his need for medical care was obvious, but that County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) tolerated, encouraged and condoned this misconduct by consciously ignoring, turning a blind eye and overlooking the misconduct.

159.   By consciously and deliberately overlooking the acts of misconduct by their subordinate officers, including Defendants Salazar, McCollum,  Toan, Bell, Dominguez, Monzon, Emeka, Young, Cortez, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100, County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) established a custom and practice of condoning and ratifying such misconduct, and established a tolerated pattern of constitutional violations amongst their subordinate officers.  The condoning of misconduct by Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) was so comprehensive and well-known that their subordinate officers were emboldened to blatantly violate the constitutional rights of person such as David Manzo.

160.   County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), through their custom and practice of encouraging, condoning, tolerating and ratifying constitutional violations by their subordinate officers, were deliberately indifferent to the constitutional violations being committed by their subordinates, including said subordinate defendants.

161.   Based on the custom and practice of condoning, tolerating, and

ratifying constitutional violations and a failure to adequately train and discipline subordinate officers who committed constitutional violations, such as Defendants Salazar, McCollum,  Toan, Bell, Dominguez, Monzon, Emeka, Young, Cortez, Bresyn, Griesinger, Mitchell,  Perez and Does 1 to 100, Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) are liable for constitutional violations committed by the said defendants for the damages suffered by plaintiff as set forth herein.

162.   Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100):

(a) failed to provide adequate supervision to the medical staff and deputies who are required to render emergency medical care that meets the standards of the Constitution;

(b) failed to comply with California law that requires a specific ratio of supervising sworn deputies to correctional deputies at RPDC;

(c)  failed to promulgate and enforce adequate policies and procedures related to rendering adequate emergency medical care that meets professional and legal standards such that the violation of citizens' civil rights by deputies and medical staff occurred and is continuing to occur in

the Riverside County jail system; and

(d) failed to promulgate and enforce adequate policies and procedures that would reduce and/or eliminate the rampant inmate-on-inmate violence occurring in Riverside County jails, particularly the 5th floor of RPDC which houses inmates with mental health conditions such that the violation of inmates' civil rights occurred and is continuing to occur in the Riverside County jail system.

163.   Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), have a widespread history of ratifying deputy misconduct by failing to conduct appropriate investigations and by encouraging and perpetuating a shroud of secrecy among jail employees regarding conditions in the jail by threatening criminal prosecution against employees who discuss jail conditions with outsiders.

164.   Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), were aware of previous instances of untimely, inadequate and improper medical care and treatment provided to inmates and rampant inmate-on-inmate violence occurring on the 5th floor of RPDC but failed to properly supervise and discipline their employees or agents to abate such

conduct.  Upon information and belief, supervising officers were made aware of the foregoing misconduct or witnessed the Constitutional violations committed by deputies and medical staff but failed to supervise or discipline them.

165.   There has been an official policy of acquiescence in the afore-mentioned wrongful conduct.  Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), have failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.  As a result, Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) failure to act to stop repeated constitutional violations in the form of inadequate medical care and violence against inmates by other inmates acts as an endorsement by Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100) of such wrongful conduct.

166.   Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), failed to supervise and insure that deputies fulfilled their full 12 hours of advanced officer medical training, instead allowing deputies and trainers to sign declarations that the training was complete when in fact, it was

83

not.  The foregoing Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

167.     As a result of their failure to properly supervise deputies and medical staff of the Riverside County Sheriff's office, Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), were deliberately indifferent to the needs of Manzo.  The failure to supervise was the moving force behind the misconduct of the deputies, the denial of medical care to Manzo, the violence perpetrated against Manzo at the hands of the other inmates and Manzo's resulting pain, suffering and mental anguish.

168.   As a result of the foregoing conduct, Manzo's Fourteenth Amendment due process rights were violated.

169.   As a direct and proximate result of the actions of Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone and other presently unascertained employees of the County of Riverside (Does 1 to 100), David Manzo suffered unconstitutional treatment and inhumane conditions while in RPDC as well as significant physical and psychological injuries.

170.     Manzo is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical

care and treatment for the remainder of his life.

## Fifth Claim

### Violation of 42 U.S.C. §1983
### Monell Municipal Liability
### By David Manzo against County of Riverside

171.    Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-170 of this complaint.

## Monell Liability – Pattern/Practice of Denying Medical Care:

172.    Defendant County of Riverside maintained an unconstitutional policy, ordinance or regulation which allowed their deputies and medical staff to deny medical care to inmates.  There were longstanding and systemic deficiencies in the Riverside County jail system, including RPDC's treatment of inmates. Deficiencies included improper cell checks, inadequate medical staffing, lack of required training or screening, diagnosis and treatment of medical and psychiatric conditions, and non-compliant medical policies and procedures. County of Riverside's failure to train its deputies regarding treatment of inmates in emergency medical situations and/or medical distress rises to the level of a municipal custom that authorized and/or condoned deputy and medical staff misconduct.

173.        Upon information and belief, the permanent, widespread, well-settled practice or custom was to deny treatment to inmates in serious medical

distress; not properly screen inmates for medical care or treatment; failing to utilize universally accepted emergency medical protocols and procedures; failing to communicate the medical needs of inmates to other staff, including outside medical facilities; not properly checking on the welfare of the inmate; failing to conduct proper cell checks as required; and not investigating misconduct of deputies and medical staff.

174.     County of Riverside's failure to render adequate medical care to inmates housed in the County jails, including RPDC was previously addressed in a class action lawsuit brought on behalf of County of Riverside jail inmates entitled *Quinton Gray v. County of Riverside*, Case No.:  EDCV 13-0444 VAP, and filed on March 8, 2013 in the United States District Court for the Central District of California.   In that case, County of Riverside entered a consent decree which was filed on June 7, 2016 wherein the County of Riverside agreed to implement remedial measures to address the failure to provide constitutionally adequate medical care to prisoners housed in County of Riverside jails.  The remedial plan included, among other requirements: that "all health care staff shall provide community standard of care" in their respective roles; that emergency procedures are to be provided "immediately"; and that in the event of a medical emergency, the inmate will be seen by health care staff at an RN level or higher "as soon as possible".

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE No: 5:17-cv-1165-JGB-SP

175.     Notwithstanding the Consent Decree, on October 25, 2016, Manzo experienced a medical emergency and County of Riverside jail staff continued to follow their longstanding policy, custom and practice of refusing to provide adequate medical care to Manzo by failing to provide any universally accepted medical and spine emergency procedures including, but not limited to, an evaluation of Manzo's condition prior to undertaking movement of Manzo's body, and use of spinal precautions like a cervical collar and backboard when transporting Manzo out of the jail.

176.     Defendant County of Riverside was deliberately indifferent to the widespread unconstitutional acts by its deputies and medical staff and failed to set forth appropriate policies regarding the treatment of inmates, even after entering a consent decree in the *Quinton Gray v. County of Riverside* case.  During the relevant period, all individually named Defendants herein, medical staff and presently unascertained employees of the County of Riverside Does 1 to 100, were acting pursuant to the policy of Defendant County of Riverside.  This pattern of deliberate indifference to basic medical needs of inmates within the County of Riverside jail system promoted and maintained a culture of deliberate indifference to human life and basic medical care and treatment for inmates at RPDC.

177.     Defendant County of Riverside was deliberately indifferent to the right of David Manzo and others to be free from, and protected from, harm caused

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

by the misconduct of its employees.  The County of Riverside's longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates and violated inmates', including David Manzo's Fourteenth Amendment right to receive medical care and due process.

178.    As a direct and proximate result of the practice or custom of Defendant County of Riverside and the individual Defendants named herein, as well as presently unascertained employees of the County of Riverside, Does 1 to 100, Manzo was denied appropriate medical care when his body was moved without the use of spinal or medical precautions of any kind, thereby rendering him a quadriplegic.

179.    The unlawful and illegal conduct of Defendant County of Riverside and the individually named defendants alleged herein, Manzo's rights, privileges and immunities secured to him by the Constitution of the United States, including, but not limited to, due process under the 14th Amendment to the Constitution was violated.

180.    Manzo is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical care and treatment for the remainder of his life.

181.    As a direct, proximate and foreseeable result, Manzo suffered damages in an amount according to proof at the time of trial.

**Monell Liability – Pattern/Practice of Failing to Protect Inmates from Violence and Cruel and Unusual Punishment**

182.   Defendant County of Riverside maintained an unconstitutional policy, ordinance, custom, practice and/or regulation which allowed their deputies to deny protection to inmates from violence at the hands of other inmates housed in Riverside County jails under the due process clause of the Fourteenth Amendment to the U.S. Constitution and to be free from cruel and unusual punishment.  There were longstanding and systemic deficiencies in the Riverside County jail system's protection of inmates from violence occurring within Riverside County jails, including RPDC.  Deficiencies included improper cell checks, inadequate staffing, overcrowding, lack of required training or screening, and non-compliant policies and procedures. County of Riverside's failure to train its deputies regarding protection of inmates from violence at the hands of other inmates housed in the jails rises to the level of a municipal custom that authorized and/or condoned deputy misconduct.

183.   Plaintiff is informed and believes and based thereon alleges that at all times stated herein, Defendant County of Riverside knew or should have known that there existed an extremely high level of inmate-on-inmate violence occurring in its jail systems, in particular the 5th Floor of RPDC based on prior reported instances of violence resulting in injury and/or death of inmates.  Such prior instances included, but are not limited to the incident involving inmate Eddy

89

Soriano and the 208 instances of violence analyzed in the RPDC Crime Study.

184.   Plaintiff is informed and believes and based thereon alleges that, at all times herein mentioned, Defendant County of Riverside, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the following policies, practices and customs:

    a.  Failing to adequately train, supervise, and control custodians of jail inmates in the proper recognition of dangerous inmates and violent situations;

    b.  Failing to adequately train, supervise and instruct custodians of jail inmates in properly monitoring, deterring, controlling and responding to inmate altercations and violence;

    c.  Failing to establish policies and procedures that enable identification and separation of extremely dangerous or violent inmates from other inmates, detainees or arrestees;

    d.  Failing to adequately train, supervise and control custodians of jail inmates in the proper response to threats of violence;

    e.  Failing to monitor video and audio surveillance of inmates closely, particularly in areas containing high risk inmates like the

90

5th Floor mental health housing at RPDC; and

f.  Failing to establish policies and procedures to reduce the risk of inmate injury by providing for immediate response to inmate violence or threats of violence.

185.  Defendant County of Riverside was deliberately indifferent to the widespread unconstitutional acts by its deputies and failed to set forth appropriate policies regarding protecting inmates from violence in the jails.

186.  The pattern of violence that was compiled in the RPDC Crime Study supports an inference that Defendant County of Riverside is promoting and maintaining a culture of deliberate indifference to the safety and security of inmates in its jail system.

187.  Defendant County of Riverside was deliberately indifferent to the right of Plaintiff to be free from and protected from harm and violence at the hands of other inmates.

188.  Defendant County of Riverside's (through the County of Riverside Sheriff's Department) longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates.

189.  As a direct and proximate result of the practice or custom of the County of Riverside, Defendant County of Riverside's employees, Wedel, Stone, Toan, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1

to 100 failed to protect Plaintiff from violence at the hands of Defendant Sanchez and Lunsted.

190.   The unlawful and illegal conduct of Defendant County of Riverside deprived Plaintiff of the rights, privileges and immunities secured to him by the Constitution of the United States.

191.   As a direct and proximate result of the foregoing, Plaintiff sustained severe injury and damage in an amount to be proven at trial.

**Monell Liability – Pattern/Practice of Use of Excessive Force:**

192.   Defendant County of Riverside Sheriff's deputies, acting under color of law, have subjected Manzo and other persons similarly situated to a pattern of conduct consisting of a continuing, widespread and persistent pattern of unconstitutional misconduct, including beating of detainees.

193.   County of Riverside failed to properly investigate complaints of excessive force; and has a widespread history of ratifying use of excessive force by failing to conduct appropriate investigations into deputy misconduct.

194.   County of Riverside knew or should have known that deputies were violating individuals' constitutional rights by using excessive force and specifically that Defendants Salazar and McCollum were violating the rights of arrestees.  County of Riverside knew or should have known that Defendants Salazar and McCollum frequently used excessive force in arresting individuals,

including beating arrestees after the arrestee had already been handcuffed and posed no threat to officer safety; that the deputies frequently ignored evidence that potential arrestees suffered from mental health disorders that required the use of Welfare and Institutions Code 5150 procedures rather than arrest; and that the deputies would arrest individuals under factual circumstances that should have led to the arrestee's evaluation by ETS rather than booking and jail.

195.     Faced with such information, County of Riverside refused to investigate the matter and/or took no remedial steps or action against Deputy Salazar and Deputy McCollum.  There has been an official policy of acquiescence in the wrongful conduct.  County of Riverside also failed to promulgate corrective policies and regulations in the face of such repeated constitutional violations.

196.     County of Riverside as a matter of custom, practice and policy, failed to maintain adequate and proper training necessary to educate deputies in the Riverside County Sheriff's Department as to the Constitutional rights of arrestees; to prevent the consistent and systematic use of excessive force by arresting deputies; and to prevent the beating and extra judicial punishment of arrestees by officers.  County of Riverside failed to provide adequate training and supervision to deputies that hold the power, authority, insignia, equipment and arms entrusted to them.

197.     Manzo is informed and believes, and based thereon alleges, that

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

high ranking County of Riverside officials, including Defendant Sniff, Di Yorio, and presently unknown supervisory officials with the County of Riverside Sheriff's Department Does 1 to 100, knew and/or reasonably should have known about the repeated acts of misconduct by Defendants Salazar and McCollum.

198.     Despite such notice, Plaintiff is informed and believes that County of Riverside approved, ratified, condoned, encouraged, and/or tacitly authorized the continuing pattern and practice of misconduct and/or civil rights violations by Sheriff's Department deputies, including, Defendants Salazar and McCollum.

199.     County of Riverside knew or should have known of the dangerous propensities of County of Riverside Sheriff's deputies, but took no steps to train them, correct their abuse of authority, or discourage their unlawful use of authority.  County of Riverside acquiesced and condoned the abusive behavior by refusing to retrain deputies, or correct their abusive behavior.  That acquiescence had advised sheriff's deputies that using excessive force to arrest a submissive arrestee was acceptable under the policies of the Riverside County Sheriff's Department.

200.     Defendant County of Riverside had knowledge of prior incidents of misconduct and civil rights violations by other deputies involving similar facts. County of Riverside knew or should have been aware that the policy regarding supervision and discipline of deputies who violated civil rights of citizens and

who commit assault and battery was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by the Riverside County Sheriff's Department deputies.

201.     County of Riverside, with deliberate indifference, disregarded a duty to protect the public from official misconduct.  The failure to promulgate or maintain constitutionally adequate training and the lack of deputy discipline was done with deliberate indifference to the rights of Manzo and others in his position. The constitutionally infirm lack of adequate training and supervision of deputies in this case caused Manzo's damages.

202.     Additionally, as a result of County of Riverside's historical failure to properly investigate complaints of deputy misconduct, County of Riverside was deliberately indifferent to the needs of Manzo.  The County of Riverside's longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to arrestees like Manzo.  The County of Riverside's failure to investigate was the moving force behind the wrongful detention and arrest of Manzo and the resulting pain and suffering Manzo experienced, and continues to experience.

203.     Plaintiff is further informed and believes, and based thereon alleges, that as a result of the deliberate indifference, reckless and/or conscious disregard of the misconduct by Defendants Salazar and McCollum, the County of

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-CV-1165-JGB-SP

Riverside encouraged those deputies to continue their course of misconduct, resulting in the violation of Manzo's rights as alleged herein.  The aforementioned acts and/or omissions and/or deliberate indifference by high ranking County of Riverside officials, including Sheriff Sniff and Undersheriff Di Yorio, resulted in the deprivation of Manzo's constitutional rights, including, but not limited to the following:

(a)  The right to be free from unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the US Constitution;

(b)  The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution;

(c)  The right to be free from the use of excessive force by police officers, which is guaranteed by the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution; and

(d)  The right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the U.S. Constitution; and

(e)  The right to be free from the imposition of cruel and unusual punishment.

204.   As a result of the foregoing conduct, Manzo's constitutional rights were violated.

205.   As a direct and proximate result of the actions of Defendants County of Riverside, Manzo suffered severe harm including significant physical and

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

psychological injuries.  Manzo is now a quadriplegic and is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical care and treatment for the remainder of his life.

### Sixth Claim

**Failure to Intervene to Protect Inmate (42 U.S.C. § 1983)**
**By David Manzo against Defendants McCollum and Salazar**

206.   Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-205 of this complaint.

207.   On September 5, 2016, Defendants McCollum and Salazar were present and were charged with the constitutional duties of protection of plaintiff and were charged with the duty to not knowingly, with wanton disregard, cause his life, health and safety to be placed in danger by intentionally and/or deliberately ignoring the known dangers to plaintiff that their actions and/or omissions placed him in.

208.   At all times relevant here, Defendants McCollum and Salazar had an affirmative duty to  intervene to stop fellow deputies from violating the constitutional rights of inmates, including Manzo.

209.   Each of the afore-mentioned defendants had ample and reasonably sufficient time and opportunity to so intervene and prevent plaintiff's injuries, and was compelled to do so as a Sheriff's deputy under the laws of the State of California and under the Constitution of the United States of America.

97

210.   In deliberate indifference to the life and welfare of plaintiff, each said defendant intentionally and with deliberate indifference to the civil rights of plaintiff, refrained from intervening in the acts leading to plaintiff's injuries, specifically, the excessive and unreasonable force used by McCollum and Salazar against Plaintiff.

211.   As a direct and proximate result thereof, Plaintiff's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution were violated.  As a further result thereof, plaintiff sustained the injuries and damages alleged herein.

212.   The conduct of Defendants McCollum and Salazar was intentional, malicious, willful, wanton and in reckless disregard of Plaintiff's constitutional rights in that this conduct shocks the conscience and is fundamentally offensive to a civilized society, so as to justify the imposition of punitive damages against Defendants McCollum and Salazar.

## Seventh Claim

**State Law Negligence**
**By David Manzo against County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100**

213.   Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-212 of this complaint.

214.   Defendant County of Riverside is subject to liability pursuant to Cal. Govt. Code section 815.2(a) which provides that a public entity is liable for injury

proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

215.   The following defendants are employees of Defendant County of Riverside: Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100.  They are subject to liability pursuant to Government Code section 820(a), which provides that a public employee is liable for injury caused by his act or omission to the same extent as a private person.  Pursuant to Government Code section 844.6(d), a *public employee* is not exonerated from liability for injury proximately caused by his negligent or wrongful act or omission.

216.   Defendants Bell, Dominguez and Monzon all knew or should have known that Plaintiff was injured, lying on the floor of the dayroom and needed medical attention after Plaintiff was attacked by inmates Sanchez and Lunsted. Each of those defendants owed Plaintiff a duty of care not to cause him further injury and to protect his health and safety by following their POST training procedures, <u>which included not moving an injured victim before medical personnel arrive</u>, or if it being necessary to move an injured victim due to an

imminent emergency, to move the victim in a straight line, so as not to cause any

damage to the injured victim's spinal cord.  Additionally, Defendants Bell,

Dominguez and Monzon each had a duty to follow jail procedures which required

that any corrections staff member who discovers, or is told of, an inmate requiring

medical assistance shall make every effort to find out the nature of the medical

problem and whether or not it is a medical emergency; if it is determined that the

situation is an urgent or emergent medical condition, the staff member shall

immediately notify central control, summon jail medical staff, and notify a

sergeant; and corrections staff shall provide appropriate and timely response to

medical emergencies consistent with officer safety, the staff member's training,

and the use of universal precautions, all <u>prior to</u> the arrival of jail medical staff.

217.   Defendants Bell, Dominguez and Monzon each breached their duties

owed to Plaintiff by failing to assess his medical situation prior to moving his

body, by moving Plaintiff's body prior to the arrival of medical staff, by not using

universal precautions as required by jail procedures prior to moving Plaintiff's

body, by failing to keep Plaintiff's body in a straight line even once they

wrongfully moved his body, and instead, dragged him around the dayroom

attempting to get him to sit or stand numerous times before ultimately throwing

him into a wheelchair to be taken out of the dayroom.  None of the actions taken

by Defendants Bell, Dominguez and Monzon were for the purpose of providing

medical care to Plaintiff.  Their actions were purely to move Plaintiff out of the

way.  None of Defendant Bell, Dominguez or Monzon's actions showed any care

or concern for the damage to Plaintiff's spinal cord they were causing.  Instead,

each of Defendants Bell, Dominguez and Monzon's actions and omissions

deliberately caused further harm to Plaintiff's spinal cord in that <u>before those</u>

<u>defendant deputies touched Plaintiff, it was apparent from the video that Plaintiff</u>

<u>could still move his limbs</u>.  Once Defendants Bell, Dominguez and Monzon

touched Plaintiff, Plaintiff became a quadriplegic.  By breaching their duties to

Plaintiff, Defendants Bell, Dominguez and Monzon caused Plaintiff's spinal cord

to be severed, rendering him a quadriplegic.

218.   As a direct and proximate result of Defendants Bell, Dominguez and

Monzon's negligence in performing their duties to protect Plaintiff's health and

safety by following jail and POST procedures for assessing injured victims and

waiting for medical staff to arrive before moving Plaintiff's body, Plaintiff

suffered damages in an amount to be proven at the time of trial.

219.   At all times stated herein, Defendants Wedel, Stone, Toan, Bresyn,

Griesinger, Mitchell, Perez and Does 1 to 100 owed a duty of care to Plaintiff to

take all reasonably necessary steps to ensure Plaintiff's personal security while he

was an inmate at RPDC and to protect Plaintiff's health and safety while Plaintiff

was housed at RPDC under protective custody status while awaiting transfer to a

mental hospital.  Under California Government Code Sections 845.6; 820(a) and

Section 815.2, Defendants Wedel, Stone, Toan, Bresyn, Griesinger, Mitchell,

Perez and Does 1 to 100 also had a duty to take reasonable action to summon

medical care when they knew, or had reason to know that Plaintiff required

immediate medical care. Under California Government Code Sections 856, 820(a)

and Section 815.2, Defendants Wedel, Stone, Toan, Bresyn, Griesinger, Mitchell,

Perez and Does 1 to 100 also had a duty to use due care in carrying out a

determination to confine Plaintiff and the terms and conditions of Plaintiff's

confinement while at RPDC.   Government Code section 856 provides that

"nothing in this section exonerates a public employee from liability for injury

proximately caused by his negligent or wrongful act or omission in carrying out or

failing to carry out…the terms or conditions of confinement of a person for mental

illness."

220.   Plaintiff is informed and believes and based thereon alleges that

Defendant Toan was on duty in the Pod control booth at the time of the incident

and witnessed the attack on Plaintiff by inmates Sanchez and Lunsted.

Defendants Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez,

Monzon and Does 1 to 100 were also on duty and charged with the protection of

inmates, including Plaintiff and knew or should have known from the length of the

fight, the noise coming from dayroom 5a while the fight occurred, and their ability

to see into the dayroom through large windows in each of the doorways, that

Plaintiff was being attacked by two inmates.  Plaintiff is informed and believes

and based thereon alleges that on the date of the incident, Defendants Toan,

Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and

Does 1 to 100 all had access to and the ability and duty to exercise control over

the inmates on the 5th floor by using various security measures available to them,

including locking cell doors to segregate certain inmates on the 5th floor from

other inmates on the 5th floor of RPDC.  Defendants Toan, Wedel, Stone, Bresyn,

Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 using

controls in the Pod control booth, could control which inmates would be permitted

into the dayroom and which would not be permitted in the dayroom.  Defendants

Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100 could

lock cell doors from within the Pod Control booth.  Plaintiff is informed and

believes and based thereon alleges that at all times, Defendants Toan, Wedel,

Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1

to 100  knew that Plaintiff was an inmate with mental health needs who was in

protective custody status and was awaiting transfer to a mental health hospital.

Plaintiff is informed and believes and based thereon alleges that at all times,

Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell,

Dominguez, Monzon and Does 1 to 100 knew that inmate Sanchez was violent

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP

and had frequently been violent toward other inmates in the jail.  Plaintiff is informed and believes and based thereon alleges that Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100  knew that by allowing Sanchez to interact with Plaintiff, they exposed Plaintiff to a serious risk of injury at the hands of Sanchez.  Defendant Toan watched the entire fight occur between inmates Sanchez, Lunsted and Plaintiff from the moment it first started when threats were being made by Sanchez against Plaintiff to the point where both inmates Sanchez and Lunsted were hitting Plaintiff and ultimately to the point where Sanchez took Plaintiff to the floor. Plaintiff is informed and believes and based thereon alleges that because Defendants Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 entered the dayroom after the fight at virtually the same time, as a group, that all of the aforementioned defendants had also witnessed the fight through the large windows existing on the doors to the dayroom and from the Pod control booth and/or had overheard the sounds of the fight occurring when they were within sufficient proximity to have responded in a prompt manner to halt the altercation before it escalated into full blown violence against Plaintiff.

221.   Plaintiff is informed and believes and based thereon alleges that Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell,

Dominguez, Monzon and Does 1 to 100 knew, or had reason to know that Plaintiff was in need of immediate medical care, yet none of the aforementioned defendants took reasonable action to summon such medical care <u>before moving and/or acquiescing in the movement of Plaintiff's body before medical staff</u> could evaluate him.

222.   Defendant Bresyn stated in reports that he watched Dominguez and Bell lifting Plaintiff from the floor of the dayroom.  Plaintiff was lifted from the floor of the dayroom <u>before</u> Plaintiff's medical condition was ever assessed by any medical staff.  Defendant Bresyn also requested the wheelchair that was used to roll Plaintiff out of the 5A dayroom.  Prior to the incident, Defendant Bresyn underwent POST training that requires deputies to refrain from moving an injured victim's body prior to being assessed by medical staff because of the likelihood of causing spinal cord injury.  In violation of his POST training procedures and jail policies and procedures, Defendant Bresyn agreed to move Plaintiff by way of a wheelchair without any spinal precautions and before medical staff had assessed Plaintiff's medical condition.  Defendant Bresyn then rolled Plaintiff, in the wheelchair, down the 5th floor hallway to another room, rather than transporting him directly to the hospital.

223.   Defendant Stone, who was a Sergeant on the scene of the incident and charged with duties to oversee, supervise and direct the conduct of the

deputies beneath him, filed a report concerning the incident.  He stated in his report that he saw Bell and Dominguez move Plaintiff from the floor of the dayroom.  The video of the incident shows that <u>before</u> Bell and Dominguez moved Plaintiff, he still had use of his limbs and was not paralyzed.  <u>After</u> Bell and Dominguez moved Plaintiff, Plaintiff became paralyzed from the neck down. Stone reported that he told Bresyn to get a wheelchair for Plaintiff.  Defendant Perez stated in his report that Stone told Bell and Dominguez to move Plaintiff onto his side.  Prior to the incident, Stone underwent POST training and knew that an injured victim's body should not be moved prior to an assessment by medical staff.  Stone knew, from his POST training that if an injured victim has to be moved because of an imminent hazard, then the victim's body should be kept in a straight line.  Stone knew that making Plaintiff sit in a wheelchair could and likely would, cause further spinal cord injury. Nevertheless, Stone ordered the wheelchair, and also ordered Plaintiff to be laid down on his side.  Stone watched and approved as Bresyn rolled Plaintiff out of the dayroom in the wheelchair that Stone had ordered. All of this occurred <u>before</u> Plaintiff's medical condition was ever assessed.

224.   Defendant Bell stated in his report that **<u>"as I walked up to Manzo, he was moving his upper body."</u>**  Video of the incident also shows that Plaintiff was not paralyzed from the neck down at the time that Plaintiff was picked up by

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-CV-1165-JGB-SP

deputies.  The County investigator who reviewed the video also confirmed that Manzo moved his upper body twice while lying on the floor waiting for medical attention, thereby confirming that Plaintiff was not yet paralyzed from the neck down when deputies entered the dayroom.  Bell stated in his report that there was blood on Plaintiff's face. Despite seeing that Plaintiff was injured and required medical attention, and <u>before</u> and without summoning for medical staff to evaluate Plaintiff, Bell and Dominguez roughly picked up Plaintiff, causing Plaintiff to become paralyzed from the neck down. Defendant Monzon also assisted in trying to lift Plaintiff with Bell and Dominguez.  After trying many times to have Plaintiff sit or stand on his own, Bell and Dominguez eventually lifted Plaintiff into the wheelchair to get him out of the dayroom.  Defendant Monzon stated in his report that when he entered the dayroom, he saw Plaintiff lying on the floor and that he was "bleeding from his head".  Monzon stated in his report that he told Defendants Bell and Dominguez that Plaintiff had a "head injury".  At the time that Monzon told Bell and Dominguez that Plaintiff had a head injury, Plaintiff is informed and believes and based thereon alleges that Defendants Stone, Wedel, Toan, Bresyn, Griesinger, Mitchell and Perez were also all present and heard Monzon say that Plaintiff had a head injury and therefore knew or should have known that Plaintiff had a head injury and that moving Plaintiff's body before summoning medical attention and before having medical staff evaluate Plaintiff

could and would cause spinal cord injury.

225.   Defendant Monzon stated after trying many times to lift Plaintiff, "Manzo appeared completely limp" and that Manzo told all of the jail staff in the dayroom that he was paralyzed.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell and Perez were all present and heard Plaintiff say (after his body had been roughly moved around many times by deputies) that he was paralyzed and each such defendant knew or should have known that plaintiff had serious injuries that required immediate medical attention.  Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell or Perez did not summon for medical care and did not give Plaintiff's emergency condition the attention it deserved as required by POST training and jail policies and procedures.

226.   None of Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell or Perez's conduct at the scene of the incident was intended to provide medical care to Plaintiff or to summon medical care for Plaintiff, but was instead, merely to move Plaintiff out of the dayroom.  All of the foregoing conduct by Defendants Stone, Wedel, Toan, Bell, Dominguez, Monzon, Bresyn, Griesinger, Mitchell or Perez caused injury and/or contributed to further injury to Plaintiff's spine.

227.   By moving and/or acquiescing in the movement of Plaintiff's body

from the dayroom before he could be evaluated by medical staff, Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 deprived Plaintiff of getting medical care that would have protected his spinal cord from being damaged.  A simple backboard, cervical collar and other universally accepted spinal precautions would have protected Plaintiff's spine from being irreparably damaged.  Instead, Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 moved and/or acquiesced in the movement of Plaintiff, thereby injuring Plaintiff, denying him access to medical care and rendering Plaintiff a quadriplegic.

228.   Even after plaintiff was wheeled out of the dayroom in a wheelchair, he was taken to a second room down the 5th floor hallway where he was then interrogated by Defendant Toan and other deputies for at least another 30 minutes before finally being taken to the hospital.  During that 30 minutes in the room down the 5th floor hallway, Plaintiff desperately told Defendants Toan, Stone, Wedel, Emeka, Cortez, Young, Bell, Dominguez, Monzon, Bresyn, Greisinger, Mitchell, Perez and Does 1 to 100 that he was now paralyzed.  Not a single individual defendant did anything to give Plaintiff's serious medical condition the emergent attention it deserved.  Plaintiff was left sitting upright in a chair in the 5th floor hallway room in excess of 30 minutes being interrogated by Defendant Toan

and other jail staff rather than being rushed on a backboard with a cervical collar to the hospital.  Defendant Toan stated in reports of the incident that Plaintiff was incoherent, mumbling and his head was "bobbing around" during the interrogation in the 5th floor hallway room.  Maintaining plaintiff in a sitting position while his blood pressure continued to drop, with his body's blood flow being detrimentally impaired, and his oxygen saturation dropping precipitously, caused further injury to Plaintiff, all of which was known to Defendants Toan, Stone, Wedel, Emeka, Cortez, Young, Bell, Dominguez, Monzon, Bresyn, Greisinger, Mitchell, Perez and Does 1 to 100.  Delaying access to appropriate (hospital) medical care inflicted unnecessary pain, suffering and discomfort on Plaintiff, all of which was known to Defendants Toan, Stone, Wedel, Emeka, Cortez, Young, Bell, Dominguez, Monzon, Bresyn, Greisinger, Mitchell, Perez and Does 1 to 100.

229.   On the day of the incident, Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 breached their various duties of care owed to Plaintiff by:  negligently failing to exercise due care in monitoring and supervising Plaintiff and Defendants Sanchez and Lunsted; failing to properly observe and/or supervise the inmates while they were in the dayroom such that threatening conduct by Sanchez against Plaintiff began and continued for several minutes; by failing to respond to and halt the threats being made by inmate Sanchez to Plaintiff, thereby allowing the situation

to escalate into full blown violence against Plaintiff; by continuing to fail to
respond to halt Sanchez from attacking Plaintiff even after witnessing Plaintiff
being punched in the head several times by inmate Sanchez, and then by inmate
Lunsted; by failing to make physical inspections and visual inspections of the
dayroom at reasonable, timely intervals in order to identify problematic inmates
who were known to be violent as needing to be segregated from protective
custody inmates like Plaintiff; by failing to follow operating procedures and
policies requiring periodic visual inspections of the cells at RPDC; by failing to
segregate inmates Sanchez and Lunsted from Plaintiff, who, due to his mental
health status, required protection from predatory inmates like Sanchez and
Lunsted; and by failing to summon for, and administer, prompt and adequate
medical attention to Plaintiff when he was first punched in the head by Sanchez
multiple times, then when Plaintiff was being attacked by both Sanchez and
Lunsted and finally, after Sanchez took Plaintiff to the floor, and it was obvious
Plaintiff was seriously injured.  Instead of summoning medical care, Defendants
Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez,
Monzon and Does 1 to 100 moved and/or acquiesced in the movement of
Plaintiff's body prior to the arrival of medical personnel, which resulted in
Plaintiff's spinal cord being severed and rendering him a quadriplegic.

230.   As a direct and proximate result of Defendants Toan, Wedel, Stone,

Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100's breached duties, Plaintiff suffered serious injuries and damages in an amount to be proven at the time of trial.

231.   At all relevant times, Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 were employees acting within the course and scope of their employment with the County of Riverside, who knew or had reason to know that Plaintiff was in need of immediate medical care and Defendants Toan, Wedel, Stone, Bresyn, Griesinger, Mitchell, Perez, Bell, Dominguez, Monzon and Does 1 to 100 failed to take reasonable action to summon such medical care.  Based on the foregoing, and pursuant to Government Code section 845.6 Defendant County of Riverside is liable for proximately causing injury by the failure of its employees to take reasonable action to summon medical care.

232.   At all times mentioned herein, Defendants Emeka, Young and Cortez were acting in the course and scope of their employment with Defendant County of Riverside and were nurses with training in handling medical emergencies and providing care to injured victims.

233.      Defendants Emeka, Young and Cortez owed Plaintiff a duty of care to provide community standard of care medical treatment to Plaintiff and not to do anything to worsen Plaintiff's medical condition.  Under Government Code

section 845.6, a public employee lawfully engaged in the practice of the healing

arts is not exonerated from liability for injury proximately caused by malpractice.

Government Code section 845.6 also provides that a public entity is not

exonerated from its obligation to pay any judgment, compromise, or settlement

that it is required to pay under section 844.6(d).  Government Code section

844.6(d) provides that a public entity shall pay any judgment based on a claim

against a public employee who is lawfully engaged in the practice of the healing

arts for malpractice arising from an act or omission in the scope of his

employment.

234.   Defendants Emeka, Young and Cortez were at all times stated herein

acting within the course and scope of their employment with Defendant County of

Riverside.

235.   Defendants Emeka, Young and Cortez breached their duty of care to

Manzo by:

(a)  failing to engage in universally accepted emergency medical evaluations,

checking vitals, triage, and first responder first aid as well as universally accepted

spinal or medical precautions before man-handling his body and/or allowing

Plaintiff's body to be moved;

(b)  improperly, negligently, wrongfully and recklessly failing to provide

constitutionally adequate medical care to Plaintiff, when each of them knew that

Plaintiff had suffered severe injuries and required immediate (hospital level)

medical attention;

(c) unreasonably delaying and denying plaintiff access to appropriate medical

care;

(d)  failing to take any action to summon medical treatment or transport Manzo

in a manner that would not cause him further harm or disability;

(e)  improperly, negligently, wrongfully and recklessly failing to follow proper

procedures for inmates showing signs of serious medical need;

236.   As a direct and proximate result of Defendants Emeka, Young and

Cortez's acts and omissions, Plaintiff suffered injuries and damages in an amount

to be proven at trial.

237.   By engaging in the foregoing acts and/or omissions, Defendants

County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone, Toan,

Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell,

Perez and Does 1 to 100 breached their duty of care owed to Manzo.

238.    The County of Riverside is responsible for the acts and/or omissions

of its individual agents and employees under the theory of respondeat superior.

239.    As a direct and proximate result of County of Riverside, Sniff, Di

Yorio, Gutierrez, Shouse, Wedel, Stone, Toan, Emeka, Young, Cortez, Bell,

Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100's

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-CV-1165-JGB-SP

negligent conduct alleged herein, Manzo suffered severe physical harm and emotional distress and is now a quadriplegic.  He is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical care and treatment for the remainder of his life.

240.   Defendants County, Sniff, Di Yorio, Gutierrez and Shouse had duties to provide for the safety and security of inmates housed in County jails and to train and supervise jail staff regarding protecting inmates from violence at the hands of other inmates and the proper procedures for handling an injured victim's body so as not to interfere with, delay or deny an inmate medical care.

241.   Defendants County, Sniff, Di Yorio, Gutierrez and Shouse breached their various duties by failing to take action to ensure the safety and protection of inmates housed in the County jails by negligently and carelessly failing to supervise, train or re-train employees in conducting safety checks, dayroom inspections, appropriate segregation of violent inmates from vulnerable inmates and the importance of following POST standards and jail procedures that required jail staff not to move the body of an inmate before the inmate was medically assessed.

242.   As a direct and proximate result of Defendants County, Sniff, Di Yorio, Gutierrez and Shouse's negligent acts and/or omissions, Plaintiff was injured when he was attacked by inmates Sanchez and Lunsted, when his head

injuries from being punched were not properly attended to and when his body was moved by deputies prior to jail medical staff assessing his condition, which proximately resulted in Plaintiff suffering catastrophic spinal cord damage and paralysis.  By Defendants County, Sniff, Di Yorio, Gutierrez and Shouse's negligent acts/omissions, Plaintiff was harmed in an amount to be proven at trial.

243.   The conduct of Defendants County of Riverside, Sniff, Di Yorio, Gutierrez, Shouse, Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and Does 1 to 100, amounts to oppression, fraud or malice within the meaning of Civil Code section 3294 et seq., and punitive damages should be assessed against each such defendant for the purpose of punishment and for the sake of example.

## Eighth Claim

### Violation of 42 U.S.C. §1983
### Excessive Force
### By David Manzo against Deputy Salazar and Deputy McCollum

244.   Plaintiff David Manzo realleges and incorporates by reference paragraphs 1-243 of this complaint.

245.   At the time of the arrest of Manzo by Defendants Salazar and McCollum on September 5, 2016, and at all times stated herein, Defendants Salazar and McCollum acted under color of law to deprive Manzo of certain constitutionally protected rights, including, but not limited to:

116

(a)  The right to be free from excessive force being used against him to affect an arrest under the Fourth, Fourteenth and Fifth Amendments to the U.S. Constitution;

(b)  The right to be free from unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the US Constitution;

(c)  The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution;

(d)  The right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the U.S. Constitution; and

(e)  The right to be free from the imposition of cruel and unusual punishment.

246.    Defendants Salazar and McCollum's conduct deprived Manzo of the foregoing constitutional rights when they used unreasonable force to arrest Manzo – specifically, when each deputy punched Manzo in the head no less than three times, when Manzo's head was already against the ground and he no longer posed any threat to the deputies.  Defendants Salazar and McCollum's conduct caused Manzo to suffer extreme pain and suffering and emotional distress, and ultimately, once he was being housed at RPDC, permanent paralysis of all four of his limbs.  Both Defendants Salazar and McCollum were integral participants in the use of excessive force.

247.    Defendant McCollum also failed to intervene to prevent the violation

when Defendant Salazar forcefully held Manzo down with his knee to the back of Manzo's neck.

248.   Defendants Salazar and McCollum knew that failure to provide timely medical treatment for Manzo could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing Manzo great bodily harm.

249.   This use of force was excessive and unreasonable under the circumstances because after being handcuffed by the deputies, Manzo did not resist, pose a threat to the safety of the officers, or attempt to evade arrest by flight.  During the relevant period, Defendant Salazar and McCollum were performing their duties as deputies of the Riverside County Sheriff's Department, which is a branch of the County of Riverside.

250.   Based on the conduct of Defendants Salazar and McCollum, Manzo was deprived of his constitutional rights under the Fourth, Fourteenth and Fifth Amendments to the U.S. Constitution.

251.   Defendants Salazar and McCollum knew that the force they used was illegal.  Manzo was subjected to humiliation, fear, physical injury, and pain and suffering by the illegal acts of Defendants Salazar and McCollum.

252.   The conduct of Defendants Salazar and McCollum was willful, wanton, malicious, oppressive, and done with reckless disregard for the rights and

safety of Manzo and therefore warrants the imposition of exemplary and punitive damages against Defendants Salazar and McCollum.

## Ninth Claim

### 42 USC § 1983 - False Arrest
### By David Manzo against Deputy Salazar and Deputy McCollum

253.   Plaintiff Manzo realleges and incorporates by reference paragraphs 1-252 of this complaint.

254.   42 USC section 1983 provides in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress."

255.   Manzo had a firmly established right under the Fourth Amendment to be free from physical abuse, assault, battery, wrongful arrest and detention and intentional and negligent infliction of emotional distress.

256.   Defendants Salazar and McCollum, while acting under color of state law, deprived Plaintiff David Manzo of his rights, privileges and immunities secured by the Constitution and laws of the United States, including those secured by the Fourth and Fourteenth Amendments to the Constitution by, among other

119

things:

    (a) Seizing Plaintiff without probable cause; and

    (b) Falsely arresting Plaintiff without probable cause.

257.   Defendants Salazar and McCollum arrived at Plaintiff's property on September 5, 2016 to find Plaintiff outside on the front lawn calmly smoking a cigarette. Defendants Salazar and McCollum did not perform any investigation into the complaining party's statements at the property before demanding that Plaintiff immediately be taken to jail. At that moment, based on defendants Salazar and McCollum's show of authority and their order that Plaintiff go immediately to jail, Plaintiff's liberties were wrongfully and unlawfully restricted. Defendant Salazar and McCollum could tell from Plaintiff's demeanor that he posed no threat to them, and it was obvious to the arresting officers after arriving at the property that the complaining party's statements to dispatch were not true and that the crimes alleged to have been committed by Plaintiff had not occurred, and that Plaintiff was not a threat to others.

258.   Nevertheless, on September 5, 2016, the defendant officers without legal justification or probable cause to believe any crime had been committed, and without a warrant, detained and arrested Plaintiff in violation of his Fourth Amendment liberty rights. Additionally, Defendants Salazar and McCollum knew at the time that they arrested Plaintiff that he suffered from a mental health

condition that rendered him mentally incompetent and lacking the mental capacity to commit any crime.  Defendants Salazar and McCollum intentionally and unlawfully exercised force or the express or implied threat of force to restrain, detain, or confine Manzo.

259.   After Manzo was already handcuffed and posed no threat to officers, Defendant Salazar forcefully put his knee to Manzo's neck, pinning him to the ground in a manner designed to cause injury and punish Manzo without due process of law.  Additionally, after Manzo was already handcuffed and was no threat to officers, Defendants Salazar and McCollum proceeded to beat Manzo.

260.   Based on the foregoing conduct of Defendants Salazar and McCollum, Manzo suffered an unlawful arrest and detention.

261.   As a direct and proximate result of Defendants Salazar and McCollum's conduct, the restraint, detention, confinement and arrest caused Manzo to suffer injury, damage, loss or harm according to proof at the time of trial.

### Tenth Claim

**Violation of Americans With Disabilities Act
By David Manzo against County of Riverside**

262.   Plaintiff realleges and incorporates by reference paragraphs 1-261 of this complaint.

263.   Under Title II of the Americans With Disabilities Act, 42 USC §

1231, et seq., and Section 504 of the Rehabilitation Act, 29 USC § 701, et seq., Manzo is a qualified individual with a disability as defined by 42 USC § 12102(1) and 29 USC § 705 because he suffers from schizophrenia, which is a mental health impairment that substantially limits Manzo's major life activities, including his ability to communicate with people, understand people, his ability to learn, and to care for himself in activities of daily living.

264.   Defendant County of Riverside authorities and other government agencies acknowledged that Manzo has such a mental health impairment/disability prior to the date of Manzo's arrest on September 5, 2016, and Manzo was regarded by himself and others as possessing that disability.

265.   At all times, Defendants Salazar and McCollum knew of Manzo's disability or should have known of his disability because Defendant Salazar had responded to Manzo's home address for welfare checks on prior occasions in which Defendant Salazar had utilized Welfare and Institutions Code section 5150 to detain Manzo and transport him to ETS for psychiatric evaluation and treatment.  Additionally, Manzo's disability is obvious to anyone talking to him because of the way in which he interacts with others and because other witnesses at the scene informed the deputies that Manzo suffered from mental health conditions and that Manzo suffered from a disability immediately before the arrest occurred.

266.   At the time that Defendants Salazar and McCollum approached Manzo on his front lawn, a reasonable accommodation for Manzo's disability could have, and should have, been made in order to avoid an escalation of the situation because Manzo's mental health disability was obvious.

267.   Defendants Salazar and McCollum failed to reasonably accommodate Manzo's disability in the course of investigating and arresting Manzo, causing him to suffer greater injury and indignity than other individuals and arrestees.

268.   Potential accommodations might have included, but are not limited to:  communicating with Manzo's caretaker, who was present at the scene; working with his caretaker to approach Manzo in a non-threatening manner, to speak to Manzo in a way that was non-threatening and calming in order to avoid an escalation of the situation and to avoid the use of force; contacting another officer or employee who specializes in communicating with disabled individuals like Manzo to facilitate the necessary interaction, removal or arrest; by respecting Manzo's comfort zone, engaging in non-threatening communications and gestures with Manzo directly, using the passage of time to defuse the situation, and ceasing the use of force once it was evident that Manzo was unarmed, terrified, no threat to officers and following their instructions.  Procedures and techniques for accommodating individuals with disabilities were also part of Defendant Salazar and McCollum's POST training and therefore, were known or should have been

123

known to Defendants Salazar and McCollum at the time of the arrest of Manzo.

269.   By declining to provide the foregoing accommodations to Manzo, Defendants Salazar and McCollum denied Manzo the benefits and services of government programs, services, or activities, as well as subjected him to discrimination on account of his disability.  As a public entity that receives federal financial assistance, Defendant County of Riverside is vicariously liable for Defendants Salazar and McCollum's violations of Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act.

270.   While Manzo was housed on the 5th Floor of RPDC Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew or should have known that Manzo was a qualified individual with a disability as defined by 42 USC § 12102(1) and 29 USC § 705 because he suffers from schizophrenia.

271.   Defendant County of Riverside authorities and other government agencies acknowledged that Manzo had such a mental health impairment/disability prior to the date of the October 25, 2016 incident because Manzo was housed as a protective-custody level inmate in the mental health portion of RPDC on the 5th floor.  Manzo was regarded by himself and other inmates, deputies and medical staff in RPDC as possessing that disability.

272.   At all times, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) knew of Manzo's disability or should have known of his disability because of his placement on the 5th floor of RPDC and through review of his classification notes, medical charts and status as a protective-custody level inmate.  Additionally, Manzo's disability is obvious to anyone talking to him because of the way in which he interacts with others.

273.   Immediately before the fight between Manzo, Sanchez and Lunsted, a reasonable accommodation for Manzo's disability could have, and should have, been made in order to avoid an escalation of the situation because Manzo's mental health disability was obvious.

274.   Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) failed to reasonably accommodate Manzo's disability in the course of housing him at RPDC and allowing him to interact with other known violent inmates who also had mental health conditions.  By failing to reasonably accommodate Manzo's disability, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently

125

unascertained employees of the County of Riverside (Does 1 to 100) caused Manzo to suffer greater injury and indignity than other individuals and inmates.

275.   Potential accommodations might have included, but are not limited to:  having separate dayroom time for Manzo that was different from other inmates housed on the 5th floor of RPDC; limiting or restricting the ability of inmates housed on the 5th floor of RPDC from coming in direct contact with Manzo; segregating violent inmates from non-violent inmates like Manzo so that instances of violence would be less likely to happen; housing Manzo in a facility that does not have a disproportionately high level of violence; and closely supervising Manzo's interactions with other inmates to watch for signs of threats or disagreements that could escalate into violence.

276.   By declining to provide the foregoing accommodations to Manzo, Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100) denied Manzo the benefits and services of government programs, services, or activities, as well as subjected him to discrimination on account of his disability.  As a public entity that receives federal financial assistance, Defendant County of Riverside is vicariously liable for Defendants Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained

employees of the County of Riverside's (Does 1 to 100) violations of Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act.

277.   Defendant County of Riverside failed to make reasonable modifications necessary to avoid discrimination against individuals with mental health disabilities, like Manzo both in the context of the arrest and the subsequent housing and supervision of Manzo on the 5th Floor of RPDC.

278.   As a result of the foregoing conduct, Manzo's rights under Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act were violated and he was discriminated against because of his disability.

279.   As a direct and proximate result of the actions of Defendants County of Riverside, Salazar and McCollum, Wedel, Stone, Toan, Emeka, Young, Cortez, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez and other presently unascertained employees of the County of Riverside (Does 1 to 100), Manzo suffered severe harm including significant physical and psychological injuries.  Manzo is now a quadriplegic and is no longer able to care for his own needs including, toileting, bathing and feeding and will require 24-hour round the clock medical care and treatment for the remainder of his life.

## Eleventh Claim

### (Claim for Battery Brought by David Manzo against Defendants Sanchez and Lunsted)

280.   Plaintiff realleges and incorporates by reference paragraphs 1 - 279

of this complaint.

281.   On October 25, 2016, Defendants Sanchez and Lunsted touched Manzo with the intent to harm or offend him by punching him in Dayroom 1 of 5A of the RPDC.

282.   Defendants Sanchez and Lunsted inflicted bodily injury on Manzo resulting in damages in an amount to be proven at trial.

283.   At no time did Manzo consent to the touching by Defendants Sanchez and Lunsted.

284.   A reasonable person in Manzo's situation would have been offended by Defendants Sanchez and Lunsted's conduct in beating Manzo.

285.   As a direct and proximate result of Defendants Sanchez and Lunsted's actions in beating Manzo, Manzo was harmed and suffered damages and severe injuries as alleged herein.

286.   Defendants Sanchez and Lunsted's conduct alleged herein amounts to oppression, fraud or malice within the meaning of Civil Code section 3294 et seq., and punitive damages should be assessed against each such defendant for the purpose of punishment and for the sake of example.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, jointly and severally, as follows:

a.  For economic damages according to proof;

b.  For non-economic damages according to proof;

c.  Punitive damages against each of the individual defendants (Sniff, Di Yorio, Gutierrez; Shouse, Wedel, Stone, Toan, Emeka, Cortez, Young, Bell, Dominquez, Monzon, Bresyn, Griesinger, Mitchell, Perez Salazar, McCollum, Sanchez, Lunsted and Does 1 to 100;

d.  Reasonable attorney fees and costs of suit pursuant to 42 U.S.C. 1988 and other relevant statutes where appropriate;

e.  Compensatory damages;

f.  Prejudgment interest;

g.  Costs of suit incurred herein and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands that the present matter be set for a jury trial.

Dated: March 12, 2018          \s_____
                                Robert Trujillo, Esq.
                                Attorney for Plaintiff David Manzo by and through his Conservator, Genoveva Manzo

Dated:  March 12, 2018          \s_____
                                Melody Trujillo, Esq.
                                Attorney for Plaintiff David Manzo by and through his Conservator, Genoveva Manzo

///

**PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES**   **CASE NO:** 5:17-cv-1165-JGB-SP

Dated:  March 12, 2018          \s_____
                                Suzanne Skolnick, Esq.
                                Attorney for Plaintiff David Manzo by and through
                                his Conservator, Genoveva Manzo

Dated:  March 12, 2018          \s_____
                                Lewis Khashan, Esq.
                                Attorney for Plaintiff David Manzo by and through
                                his Conservator, Genoveva Manzo

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES   CASE NO: 5:17-cv-1165-JGB-SP